## In the

# United States Court of Appeals

## For the Second Circuit

————————————————————————

August Term, 2020

Nos. 18-3617-cr, 19-1051-cr

UNITED STATES OF AMERICA,

*Appellee,*

v.

LARRY WILLIS, ISIAH PIERCE

*Defendants-Appellants.*

———————————————————

Appeal from the United States District Court
for the Western District of New York
No. 17-cr-32 (LJV), Lawrence J. Vilardo, District Judge, Presiding.
(Argued: December 7, 2020; Decided: July 16, 2021)

Before:

POOLER, PARKER, and LYNCH, *Circuit Judges.*

Defendants-Appellants Larry Willis and Isiah Pierce appeal from judgments entered by the United States District Court for the Western District of New York (Lawrence J. Vilardo, *J.*) following their convictions on multiple drug- and gun-related counts. Willis and Pierce contend that there was insufficient evidence to support their convictions and raise various issues relating to the

conduct of their trials and sentences. We conclude that sufficient evidence supported their convictions, and we see no errors that would require a new trial. Accordingly, we AFFIRM the judgments. However, because the district court clearly erred in its factfinding regarding jointly undertaken criminal activity and failed to rule whether Willis's sentence would run concurrently to an undischarged state sentence, we VACATE and REMAND his sentence for resentencing and clarification on these issues.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED

_____

KATHERINE A. GREGORY, Assistant United States Attorney *for* James P. Kennedy, Jr., United States Attorney for the Western District of New York, Buffalo, N.Y., *for Appellee*.

CARLA M. SANDERSON Carla Sanderson Law, New York, N.Y., *for Defendant-Appellant Willis*.

ROBERT A. CULP Garrison, N.Y., *for Defendant-Appellant Pierce*.

_____

BARRINGTON D. PARKER, *Circuit Judge*:

Larry Willis and Isiah Pierce appeal from judgments of conviction entered following a three-day trial in the United States District Court for the Western District of New York (Vilardo, *J.*). The defendants, charged in a twelve-count superseding indictment, were convicted of various drug-related crimes and

2

firearms offenses.[1] The district court denied defendants' motions for judgments of acquittal. *See* Fed. R. Crim. P. 29. Pierce was sentenced to 168 months and Willis to 210 months of incarceration.

On appeal, defendants contend that the evidence was insufficient to support the jury's verdict on each of the counts of conviction. They also challenge various of the district court's evidentiary rulings and its calculation of the sentences recommended by the Sentencing Guidelines ("U.S.S.G." or

---

[1]      Both defendants were charged in the following: Count 1, narcotics conspiracy in violation of 21 U.S.C. § 846; Count 2, possessing 28 grams or more of cocaine base with intent to distribute in violation of 21 U.S.C. §§ 841 (a)(1) and (b)(1)(B); Count 3, possessing 100 grams or more of heroin and butyryl fentanyl with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); Count 4, possessing 40 grams or more of fentanyl with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); Count 5, possessing powder cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); Count 6, maintaining a drug involved premises in violation of 21 U.S.C. § 856(a)(1); Count 7, possessing firearms in furtherance of drug trafficking crimes in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2. For Counts 2 through 7, both defendants were also charged with aiding and abetting the alleged crimes in violation of 18 U.S.C. § 2.

Willis was individually charged in Count 9, possessing firearms and ammunition as a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); Count 10, possessing heroin with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and Count 11, possessing cocaine base with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

Pierce was individually charged in Count 8, possessing firearms and ammunition as a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and Count 12, possessing cocaine base with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

"Guidelines"). For the reasons that follow, we affirm the convictions, but remand Willis's sentence.

**BACKGROUND**

The issues raised on appeal center on Willis's and Pierce's use of two apartments—the upper and the lower—at 70 Henrietta Avenue, Buffalo, New York("70 Henrietta") from which they conducted a drug trafficking operation. Officers of the Erie County Sheriff's Office ("ECSO") executed search warrants at that location and seized narcotics, drug trafficking paraphernalia, firearms, and ammunition.

Testimony adduced by the government at trial established that on the morning of December 1, 2016, the ECSO had attempted to execute a warrant authorizing a search of 108 Peck Street, of Willis's person, and of his black Pontiac Grand Prix. Efforts to locate Willis led them to the two apartments at 70 Henrietta. While conducting surveillance, Detective William Granville of the ECSO saw a dark-colored Dodge Charger pull into the front of 70 Henrietta, followed closely by a blue Chevrolet Equinox (the "Equinox"). Defendant Isiah Pierce was driving the Charger, while Tanzie Fuller was driving the Equinox,

which was registered to Willis. The drivers of both vehicles got out and entered the front door at 70 Henrietta.

After a short period, Pierce and Fuller exited 70 Henrietta, and both got into Willis's Equinox. Shortly thereafter, Officer Cully Ferrick stopped Pierce who was driving the Equinox for excessive tint on the glass. After a brief conversation, Detective Timothy Donovan asked him to step out of the vehicle because he "smelled the odor of marijuana." Pierce App'x at 51. The officers searched the vehicle and recovered a "violation" or non-criminal quantity of marijuana, as well as five cellphones. A search of Pierce's person turned up approximately $1,700 in cash and a set of keys. At that point, Pierce was arrested, searched, and taken to the ECSO headquarters at 45 Elm Street ("45 Elm"). Once they arrived, Pierce was left handcuffed in an interview room. Detective Donovan testified that at some later point he went back into the interview room and "found a large amount of narcotics that were underneath the desk area" that had not been in the room when he first left Pierce there. Pierce App'x at 55.

Although none of these materials had been found in the search incident to Pierce's arrest, Donovan testified that he found "a plastic bag which contained numerous knotted plastic bags that contained white rock-like substance that

appeared to be cocaine, and also bundles full of what appeared to be heroin"

along with "glass wax envelopes that are commonly used to package heroin."

Pierce App'x at 56.

While Pierce was being detained by the ECSO, Detective Granville continued his surveillance of 70 Henrietta. Detective Granville testified that around 2:15 PM, he saw Willis leaving 70 Henrietta, appearing to lock the front door, entering a black Pontiac, and driving away. Around 2:30 PM, officers stopped Willis's car, searched and arrested him, and searched the car from which they recovered cash, keys, and two cellphones. Detective Granville testified that, after seeing Willis leave, he remained outside 70 Henrietta for two additional hours until about 4:15 PM when he was notified that other officers were coming to 70 Henrietta to execute a search warrant.

After Willis was arrested, he was brought to 45 Elm where he was placed in an interview room. Detective Timothy Carney testified that he saw Willis "digging down his pants," that he and Detective Granville entered the room, and that Detective Granville located narcotics in a bag on the floor. Willis App'x at 70. In the bag, the officer claimed to find yellow bags commonly used for packaging heroin, and bags that contained crack cocaine and heroin. The drugs found on

the floor at 45 Elm were the subject of Counts 10 and 11 charging Willis with possession of heroin and cocaine with intent to distribute and Count 12 charging Pierce with possession of cocaine with intent to distribute. Both defendants were acquitted on these counts.

Later that day, the officers executed a search warrant for the lower apartment at 70 Henrietta. Keys recovered from Willis at his arrest opened the front door at 70 Henrietta, as well as the door to the lower apartment. The officers recovered a cache of weapons including assault rifles, a pistol, magazines, and rounds of ammunition. The officers also recovered 10.35 grams of cocaine base and tools of the drug trade including baking soda, digital scales with traces of white powder, a metal strainer, bags, whisks, a spoon, a fork, a large quantity of small rubber bands, razors, a latex glove, and a metal weight. In addition, the officers seized a title, in Willis's name, to the Chevrolet Equinox that Fuller and Pierce had been driving earlier, insurance documents in the name of Larry Willis, a Buffalo police incident card, a traffic ticket, DMV paperwork, and photographs of Willis and Pierce together.

Later that evening, the officers executed a search warrant for the upper apartment. Keys recovered from Pierce at his arrest opened the front door of 70

Henrietta, the door to the upper apartment, and a padlocked bedroom door in that apartment. The keys also included a Tops Friendly Markets Bonus Card on the key ring that was connected to the account of Pierce's girlfriend, Courtney Brouse.

Inside the upper apartment, officers recovered a separate cache of weapons that included handguns, a large capacity magazine, rounds of ammunition, a digital scale, packaging materials, and three bags containing 167.98 grams of butyryl fentanyl and heroin. The officers also recovered cocaine base and additional quantities of heroin, fentanyl, and butyryl fentanyl. The total weight of the additional heroin and fentanyl was approximately 50 grams. The weight of the cocaine seized was approximately 142 grams of base, and approximately 253 grams of powder. One of the main factual issues on appeal centers on whether the contraband found in the two apartments could be attributed to either or both defendants.

The arresting officers subsequently obtained warrants to search the phones seized from Willis and Pierce. One of the phones recovered from the Equinox had received texts addressing the recipient as "Zeke," Pierce's nickname, and inquiring about Pierce's girlfriend and daughter, tending to show that the phone

belonged to Pierce. The phone had also received a text message saying "Yo, everyone like that tester, said it was real good, the best they seen. But I'm out of work. Got half a bun." Doc. 201 at 19.

Both defendants were subsequently indicted and proceeded to trial. The government's theory was that the two apartments were jointly used by Willis and Pierce to manufacture and distribute drugs. The government argued that Willis resided in the lower apartment, pointing to his ownership of keys to the unit and the presence of his personal effects there. Pierce, according to the government, controlled the upper unit as evidenced by his possession of keys to the unit and to the padlocked interior bedroom where the drugs and guns were found. As evidence of joint control, the government argued that after being taken to 45 Elm, Willis discarded heroin and cocaine wrapped in the same yellow packaging found in the upper unit and that the crack cocaine Pierce discarded at 45 Elm was wrapped in blue envelopes that were the same as those found in the lower unit.

The jury returned a mixed verdict. Willis was convicted of possessing less than 28 grams of cocaine base with intent to distribute (Count 2); possessing powder cocaine with intent to distribute (Count 5); maintaining a drug involved

premises (Count 6); possessing a firearm in furtherance of a drug trafficking crime (Count 7); and possession of firearms and ammunition as a felon (Count 9).

Pierce was convicted of possessing 28 or more grams of cocaine base with intent to distribute (Count 2); possessing 100 grams or more of heroin and butyryl fentanyl with intent to distribute (Count 3); possessing 40 grams or more of fentanyl with intent to distribute (Count 4); possessing powder cocaine with intent to distribute (Count 5); maintaining a drug involved premises (Count 6); possessing a firearm in furtherance of drug trafficking (Count 7); and possession of firearms and ammunition as a felon (Count 8).

Both defendants were acquitted of the narcotics conspiracy charged in Count 1, and of possessing the cocaine base and heroin that two officers claimed to have found in the interview rooms at 45 Elm as charged in Counts 10, 11, and 12. Willis was also acquitted of possessing the heroin and fentanyl found in the upper apartment charged in Counts 3 and 4. After trial, both defendants moved for judgments of acquittal under Federal Rule of Criminal Procedure 29 challenging the sufficiency of the evidence supporting their convictions. The district court denied both motions.

Prior to sentencing, Willis filed objections to certain factual portions of the Pre-Sentence Investigation Report ("PSR"). He argued against the PSR's attribution to him of: currency recovered from Pierce, currency recovered from 369 Wabash Avenue ("369 Wabash"), the quantities of drugs found in the upper apartment, and the total quantity of drugs found at 45 Elm (which he had been acquitted of possessing).

The district court agreed with Willis in part, finding that the currency found at 369 Wabash, the home of Pierce's girlfriend Courtney Brouse, was not attributable to Willis, but accepted the remaining facts in the PSR as its findings. The district court concluded that the drugs located in the upper apartment and the interview rooms at the police station were "possessed within the scope and in furtherance of the jointly undertaken criminal activity and were reasonably foreseeable," Willis App'x at 135, and incorporated into the Guidelines calculation all the drugs from the upper apartment and the cocaine base that Willis and Pierce were acquitted of possessing in the police interview rooms at 45 Elm. These findings had a significant effect on the district court's Guidelines

calculation. The inclusion of the disputed contraband increased Willis's base offense level on Counts 2, 5, and 6 from 24 to 30.[2]

The district court determined that Willis's Guidelines range was 248 to 295 months. The district court agreed with Willis that the Guidelines were "too high," Willis App'x at 163, and sentenced Willis to 150 months concurrently on all counts, except for a mandatory consecutive 60-month term for possession of a firearm in furtherance of drug trafficking, for an aggregate term of 210 months' imprisonment. The district court did not state explicitly whether Willis's federal sentence would run concurrently to a then-anticipated state sentence, although Willis's counsel had noted on the record his assumption that this was the district court's intention. After calculating Pierce's Guidelines range, the district court sentenced Pierce to 168 months.[3]

---

[2] The district court also applied a two-level enhancement under U.S.S.G. § 2d1.1(b)(12) for maintaining a premises for the purpose of manufacturing or distributing a controlled substance.

[3] Pierce does not challenge his sentence. Accordingly, we need not discuss the details of his sentencing. While Pierce contends that the district court plainly erred in authorizing forfeiture of currency and cars, Pierce has not sufficiently argued this issue on appeal. "Merely mentioning or simply stating an issue in an appellate brief is insufficient to preserve it for our review." *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012). Pierce fails to cite to any evidence that the currency and cars did not constitute drug proceeds, and the order itself notes that no third parties filed claims to the assets despite receiving notice that the assets would be forfeited.

This appeal followed.

**DISCUSSION**

Defendants contend that the government failed to adduce sufficient evidence on all counts of conviction. Because, as discussed below, the government's evidence of guilt on nearly all counts was substantial, we discuss in detail only the defendants' colorable insufficiency arguments. Willis, in this regard, contends that though the evidence at trial supported the inference that he had access to the lower apartment, it was insufficient to prove that he possessed the cocaine base and firearms found in the lower apartment, and the powder cocaine found in the upper apartment. Willis also argues that the district court improperly calculated his Guidelines range when it found that, though acquitted of the charged conspiracy, he jointly possessed all the narcotics in the upper apartment with Pierce. As noted, this issue bears heavily on his sentence.

Pierce, for his part, argues that the evidence produced at trial equally supports the inference that others connected to the apartments controlled the drug operation and possessed the drugs and the weapons seized by law enforcement. Pierce also contends that the district court abused its discretion in denying his motion for a new trial on ineffective assistance of counsel grounds,

and that the defendants were denied a fair trial because the district court improperly allowed expert testimony of a Drug Enforcement Agency ("DEA") witness concerning the means and methods of drug trafficking, allowed testimony of the parole officers of Willis and Pierce "thus underscoring their prior convictions," and allowed the government in its summation to "improperly invite[] the jury to help law enforcement solve the drug problem." Pierce Br. at 51-52.

**I**

*A. Legal Standards*

In evaluating the sufficiency of the evidence, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In performing this analysis, we are required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury's verdict. *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). In

addition, we must "consider the evidence presented in its totality, not in isolation." *United States v. Anderson*, 747 F.3d 51, 59 (2d Cir. 2014).[4]

The defendants contend that the government adduced insufficient evidence that either of them possessed any of the contraband recovered from 70 Henrietta. At trial, the government pursued theories of constructive possession. "Constructive possession exists when a person has the power and intention to exercise dominion and control" over the contraband in question and may be shown by direct or circumstantial evidence. *United States v. Payton,* 159 F.3d 49, 56 (2d Cir. 1998). Mere presence is insufficient. However, "presence under a particular set of circumstances from which a reasonable jury could conclude that the defendant constructively possessed contraband" is sufficient. *United States v. Facen*, 812 F.3d 280, 287 (2d Cir. 2016). For example, documents pertaining to a defendant found in the same location as narcotics, possession of a key to the location where drugs are found, or whether the drugs are in plain view, are factors relevant to constructive possession. *Facen*, 812 F.3d at 287 (collecting cases). Once possession of narcotics has been established, a defendant's possession of firearms, and "of equipment to weigh, cut and package drugs is

---

[4]     Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

highly probative of a purpose to distribute." *United States v. Martinez*, 54 F.3d 1040, 1043-44 (2d Cir. 1995).

*B. Discussion*

Pierce argues that the evidence produced at trial supports the inference that other people—some combination of Tanzie Fuller, his codefendant Willis, or the individuals named on the lease and otherwise connected to the apartments— possessed the drugs and the weapons found in the upper apartment. Regarding the keys in particular, Pierce argues that the circumstances of the surveillance and arrest suggest that Tanzie Fuller also could have been the owner of the keys.

To be sure, it is true that the evidence produced at trial connecting Pierce to 70 Henrietta—and consequently to the drugs and weapons which were recovered—did not rule out an inference that others were involved in the drug trafficking at that location. However, the government was not required to prove that the contraband was not subject to the control of others, because possession need not be exclusive, and the jury was not required to accept Pierce's alternative explanation of innocence. *United States v. Gaines*, 295 F.3d 293, 300 (2d Cir. 2002); *see United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008) ("the Government is not required to preclude every reasonable hypothesis which is consistent with

innocence"). In other words, the fact that others may have also possessed the keys, drugs, and weapons does not preclude a finding that Pierce did so as well.

Even so, the government's evidence that the keys belonged to Pierce was compelling. Pierce was arrested in possession of the keys and a key ring on the keys held a Tops Friendly Markets Bonus Card belonging to Courtney Brouse, his girlfriend and the mother of his child. In addition, the government introduced a recorded statement made by Pierce to Brouse from jail that "they have my keys." Gov't App'x at 88. Law enforcement officers found large quantities of narcotics and multiple weapons in a padlocked room inside the upper apartment to which Pierce held the keys. A test of DNA found on a loaded Ruger 9mm semi-automatic firearm there could not exclude Pierce as a contributor to the mixture of DNA, with it being 33,000 times more likely to be a match to Pierce than to a random individual. Finally, the jury heard evidence that a cell phone tied to Pierce received multiple text messages discussing what a law enforcement witness testified was evidence of drug transactions. Given these facts, a rational trier of fact could conclude that Pierce controlled the upper apartment as well as the contraband seized there.

For similar reasons, the evidence was sufficient for a jury to conclude that Willis constructively possessed the cocaine base and weapons found in the lower apartment. Willis was observed alone at 70 Henrietta for several hours on December 1, 2016. He possessed keys to the front door and to the lower apartment which contained various of his personal effects including his car registration, insurance documents, clothing, and personal photos. Additionally, law enforcement recovered a semi-automatic rifle on which DNA that likely matched Willis's was identified as well as tools of the narcotics trade. This evidence was sufficient for a jury to conclude that Willis had access to, and control over, the lower apartment, and therefore possessed the weapons and cocaine base therein.

It is a closer question whether sufficient evidence supports Willis's conviction for possession of the powder cocaine found in the upper apartment. There was no evidence that Willis possessed a key to the upper apartment or to the padlocked closet in which the cocaine powder was stored. Neither his documents nor personal effects were found there and no forensic evidence otherwise connected him to it. The drugs found there were not in plain view, and he was not arrested under circumstances that suggested that he had complete

control over the drugs. In other words, the indicia of dominion and control that tied Willis so strongly to the lower apartment do not exist for the upper apartment.

Nonetheless, even if the evidence did not establish that Willis had dominion and control over the upper apartment, a rational jury could have concluded that he possessed the cocaine powder found there, if not directly, then through others, namely Pierce. This is because the superseding indictment charged Willis with committing and, in the alternative, aiding and abetting, the crime of possession of cocaine with intent to distribute it and the district court instructed the jury on this charge.

"Under 18 U.S.C. § 2, a defendant may be convicted of aiding and abetting a given crime where the government proves that the underlying crime was committed by a person other than the defendant, that the defendant knew of the crime, and that the defendant acted with the intent to contribute to the success of the underlying crime." *United States v. Hamilton,* 334 F.3d 170, 180 (2d Cir. 2003). A conviction under § 2 requires sufficient proof that the defendant knowingly and willfully participated in the offense in a way that showed he intended to make it succeed.

19

Willis argues that a finding that he "aided" Pierce is impermissible because the government failed to prove that Willis joined Pierce's venture with knowledge of Pierce's crimes and the specific intent to further them. He asserts that the government's contention that the firearms in the downstairs apartment were meant to protect the drugs in the upstairs apartment was not supported by evidence because there were firearms in the upper apartment as well as the lower apartment. He also asserts that "tools and materials [of the trade] were also present in the upper unit, including digital scales, plastic sandwich bags, other plastic baggies and a plastic spoon with suspected drug residue." Willis Br. at 44. But the fact that others may have also packaged and manufactured drugs in the upper apartment does not mean that Willis did not aid and abet the crime charged. All the tools necessary to manufacture cocaine base were found in the lower apartment including baking soda, digital scales with traces of white powder, a metal strainer, bags, spoons, latex gloves, and a metal weight. Most of these items were not found in the upper apartment. Given these facts, a jury could reasonably have concluded that Willis intended for Pierce, the guilty principal, to possess the powder cocaine. There was sufficient evidence for a reasonable jury to conclude that Pierce possessed the cocaine, and that Willis

aided in the commission of the crime by maintaining a stash house in the lower apartment, by manufacturing cocaine base (a necessary ingredient of which is cocaine powder) with the tools of the trade found exclusively in the lower apartment, and by keeping firearms there to protect the enterprise. S*ee United States v. Santos*, 541 F.3d 63, 72 (2d Cir. 2008) (explaining that "advancing the aim of a narcotics conspiracy can involve performing ancillary functions"); *United States v. Boissoneault*, 926 F.2d 230, 234 (2d Cir. 1991) (noting that evidence of intent may be found in the "paraphernalia usually possessed by drug dealers" or the "materials needed to process cocaine or to package it"). The government also presented evidence that Pierce was arrested driving a car registered to Willis, the keys of which were linked to the multi-key ring that also opened the upper apartment. On the basis of these facts, we conclude that a rational jury could conclude that Willis aided and abetted Pierce's possession of cocaine powder with intent to distribute it.[5]

---

[5]  Any arguable inconsistency between the jury's conclusion that the government had not established a conspiracy beyond a reasonable doubt and the jury finding that Willis aided and abetted Pierce does not change this conclusion. *See Dunn v. United States*, 284 U.S. 390, 393 (1932) ("Consistency in the verdict is not necessary."); *see also United States v. Carbone*, 378 F.2d 420, 422 (2d Cir. 1967) (discussing *Dunn*); *United States v. Tyler*, 758 F.2d 66, 70-71 (2d Cir. 1985) (noting that "there is nothing inconsistent in our determination that the evidence was insufficient with respect to the conspiracy

**II**

Both defendants were convicted under Count 6 for maintaining a premises where drugs were manufactured or distributed. *See* 21 U.S.C. § 856(a)(1). To convict under this statute, the government was required to prove that the defendants "(1) used a place; (2) for the purpose of distributing or packaging controlled substances; and (3) did so knowingly." *Facen*, 812 F.3d at 290.

The government adduced sufficient evidence that both defendants violated this provision. That evidence established that Willis possessed the cocaine powder and cocaine base as well as cutting agents, packaging materials, and firearms found at 70 Henrietta. That evidence also established that Pierce possessed powder cocaine, cocaine base, heroin, and fentanyl at that location and that the upper apartment contained little else but this contraband. Indeed, the evidence strongly supported an inference that the apartment was used for little else than for distributing and packaging narcotics. The seized narcotics and drug paraphernalia were in sufficient quantity for the jury to conclude that the defendants intended to distribute them.

---

count but sufficient with respect to the aiding and abetting count" because the "two offenses are separate and distinct").

**III**

To convict for possession of a firearm in furtherance of a drug trafficking offense under 18 U.S.C. § 924(c), "the government must prove that the defendant possessed the firearm and that the possession occurred in furtherance of a drug trafficking crime." *See United States v. Albarran*, 943 F.3d 106, 118 (2d Cir. 2019).

Section 924(c) requires the government to establish a "nexus" between the charged firearm and the charged drug selling operation. *United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001). That nexus is established where the firearm "afforded some advantage (actual or potential, real or contingent)" to the drug trafficking. *United States v. Lewter*, 402 F.3d 319, 322 (2d Cir. 2005). Section 924(c)(1)(A) applies where the charged weapon is readily accessible to protect drugs, drug proceeds, or the dealer himself. *See id*. at 323. We conclude that the evidence of guilt on this Count was sufficient as to both defendants.

Regarding Willis, a semi-automatic rifle—attributed to him as a likely match by DNA evidence—was concealed in a box by the front door of the lower apartment. A loaded .357 caliber Magnum pistol was found under a couch cushion, and Willis's DNA generated a likely match. Both weapons were readily accessible to protect the contraband. While Willis argues that he could have

possessed the weapons for purposes other than drug trafficking, the combination of drugs and tools of the drug trade in the lower apartment, and the fact that Willis lived elsewhere, provide adequate support for the jury's verdict that the firearms were used in furtherance of drug trafficking.

Regarding Pierce, a loaded Ruger handgun—attributed to him as a likely match by DNA evidence—was found inside the padlocked upper apartment room to which he held the key. This loaded handgun was readily accessible to protect the powder cocaine, cocaine base, heroin, and fentanyl found near the gun. Notably, Pierce did not live where the weapons were located and kept them at an apartment that served as a stash house. Because the weapons were readily accessible to protect drugs or drug proceeds, a rational trier of fact could have found that Pierce was guilty of possessing a weapon in furtherance of drug trafficking.

**IV**

*A. Evidentiary and Summation Challenges*

Defendants argue that the district court abused its discretion in certain of its evidentiary rulings. They argue that it was error for the district court to allow a DEA witness to present expert testimony concerning the "means and methods

of drug trafficking" and then to permit the testimony of the parole officers of Willis and Pierce which, according to them, served no purpose other than underscoring their prior convictions. Finally, they contend that the district court improperly allowed the prosecutors to excessively compliment the investigating officers during closing arguments, thereby allowing the government to "improperly invite[] the jury to help law enforcement solve the drug problem." Pierce Br. at 51-52. Defendants assert that this trio of errors combined to deny them a fair trial. Defendants' challenges are without merit.

We review the district court's evidentiary rulings for abuse of discretion. *See United States v. Fazio*, 770 F.3d 160, 165 (2d Cir. 2014). "[S]o long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational." *United States v. Scully*, 877 F.3d 464, 474 (2d Cir 2017).

When parties seek to introduce expert testimony in accordance with Rule 702 of the Federal Rules of Evidence, the trial judge has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The district court must analyze whether the proffered expert testimony is relevant

and "whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered." *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004). "A district court's decision to admit expert testimony will not be reversed unless it is manifestly erroneous." *Boissoneault*, 926 F.2d at 232.

Over Pierce's objection, the government proffered that it intended to ask Special Agent James McHugh, a DEA expert witness, whether certain items found at 70 Henrietta were "the kinds of paraphernalia or tools that are typically found in the possession of people who are distributing narcotics." Doc. 201 at 205. The district court ruled that the expert witness could testify only "in general terms," about those items but could not review photos of or testify about the actual paraphernalia found at 70 Henrietta. Doc. 201 at 206; *see United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir. 1987).

When testifying, the government's witness stayed within these bounds. The government asked whether items like "whisks, sifters, and mixers [] have any role [in] narcotics trafficking," and the witness confirmed that these were "typical tools" of the trade. Doc. 201 at 212-13. Further, the witness testified that references to "stamps" in text messages could refer to packaging for cocaine or heroin.

We are cautious of "the risk that 'dual' police testimony may prejudice defendants at trial, both inflating an officer's expert opinions through his personal involvement in the case and bathing his lay testimony in the aura of 'expertise'." Anna Lvovsky, *The Judicial Presumption of Police Expertise*, 130 HARV. L. REV. 1995, 2025 (2017); *see United States v. Dukagjini*, 326 F.3d 45, 53-54 (2d Cir. 2003). Here, however, McHugh was not such a witness. While he described the significance of language and physical evidence in the abstract, he drew no specific conclusions about the significance of that conduct or of the language in this particular case, which weakens any claim of prejudice. We conclude that the district court did not err in admitting McHugh's testimony.

Nor was it manifestly erroneous for the district court to admit testimony from defendants' parole officers. The government justified the need for the testimony on the theory that the parole officers were familiar with the defendants' familial relationships and their living situations. At trial, Parole Officer McPartland testified to the familial relationship between Pierce and the leaseholder at 70 Henrietta, Pierce's nickname "Zeke," Pierce's long-term relationship with his girlfriend Courtney Brouse, and the fact that Pierce lived with Brouse at 369 Wabash.

Defendants objected on the grounds that the testimony "underscor[ed] their prior convictions," "was of minimal value," and was merely cumulative. Pierce Br. at 51, 55. Although the testimony may well have reminded the jury that the defendants had prior criminal convictions, any prejudice was minimal. The jury already knew that the defendants were predicate felons because they had stipulated to those prior convictions. Moreover, the testimony did have probative value. It was probative of Pierce's relationship to individuals directly connected to 70 Henrietta, and of Pierce's nickname, "Zeke" which appeared in multiple text messages discussing drug transactions, and the district court weighed the evidence's risk of prejudice with its probative value. Pierce asserts that this information "came in through other witnesses anyway," but does not provide any record support for the assertion. Pierce Br. at 55. In any event, a mere showing "of some alternative means of proof" is insufficient to establish an abuse of discretion. *Old Chief v. United States*, 519 U.S. 172, 183 n. 7 (1997).

Finally, the defendants' challenge to the government's summation likewise fails. Defendants assert that it was inappropriate for the government to comment on the "dedication and perseverance of the Erie County Sheriff's office detectives working to get [] weapons and [] addictive drugs … out of the community" and

28

to reference the detectives "chas[ing] down all sorts of leads, every red herring, until the last pieces of the puzzle came together and the picture was clear." Gov't App'x at 83–84.

"A defendant asserting that a prosecutor's remarks warrant a new trial faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial." *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012). "In determining whether an inappropriate remark amounts to prejudicial error, we look to the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010). Because the defendants did not object to any of the summation at trial, their challenge is subject to plain error review. *See* FED. R. CRIM. P. 52(B).

Applying these principles, we see no error and certainly no plain error. The defendants have not demonstrated that any of these remarks were sufficiently improper to have denied them a fair trial. In other words, this is not the "rare case in which [alleged] improper comments in a prosecutor's

summation are so prejudicial that a new trial is required." *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992).[6]

B. *Rehaif-related Section 922(g) Challenges*

Defendants argue that their convictions as felons in possession of firearms under 18 U.S.C. § 922(g) must be vacated in light of the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019). There, the Court held that a defendant's knowledge of his status as a felon is an element of the offense and that the government bore the burden of proving that knowledge. *Id.* at 2194. *Rehaif* was decided after their convictions and the issue reaches us on plain error review.

Subsequent to *Rehaif,* this Court decided *United States v. Miller, et al.*, 954 F.3d 551 (2d Cir. 2020) and *United States v. Balde*, 943 F.3d 73 (2d Cir. 2019). Both cases effectively foreclose the defendants' attacks on their convictions. When

---

[6] Pierce also raises various issues relating to the effectiveness of his trial counsel. Though it is not a rigid rule, this circuit has a "baseline aversion to resolving ineffectiveness claims on direct appeal." *United States v. Leone*, 215 F.3d 253, 256 (2d Cir. 2000). We do not believe that the record is sufficiently developed for us to appropriately assess Pierce's ineffective assistance of counsel claim. We thus refrain from deciding it and Pierce is free to raise the claim in a petition for habeas corpus under 28 U.S.C. § 2255. *See United States v. Oladimeji*, 463 F.3d 152, 154 (2d Cir. 2006).

reviewing for plain error, we consider whether "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Miller*, 954 F.3d 551, 557–58 (2d Cir. 2020). Here, it is undisputed that the first two elements of the plain error test were met. The jury was not instructed consistent with *Rehaif*, and that was clearly error. We need not reach the third element – whether the error affected the appellant's substantial rights – since we conclude that the fourth element was not met; the error did not affect the fairness, integrity or public reputation of the judicial proceedings.[7]

In *Miller*, this Court held that the erroneous jury instruction was not reversible plain error because the defendant's PSR revealed that he was

---

[7] Defendants' *Rehaif*-related jurisdictional challenge to the superseding indictment also fails. Federal courts have jurisdiction to adjudicate a criminal charge as long as "the indictment alleges an offense under U.S. criminal statutes." *United States v. Prado*, 933 F.3d 121, 134 (2d Cir. 2019). "[T]he standard for the sufficiency of an indictment is not demanding," *Balde*, 943 F.3d at 89, and requires little more than that the indictment "track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime," *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013). The superseding indictment here, which tracks the language of § 922(g)(1), plainly meets this standard. *See Balde*, 943 F.3d at 89–91 (holding that an indictment tracking the statutory language of § 922(g)(5)(A) remains jurisdictionally sufficient after *Rehaif*).

sentenced to, and served, more than one year in prison for a prior felony conviction. 954 F.3d at 559-60. In this case, it is undisputed that both defendants were sentenced to, and served, more than one year in prison for their prior felony convictions. Their stipulations to that fact conclusively prove that they knew of their status. *See id.* at 560 (noting that "had the *Rehaif* issue been foreseen by the district court, [defendant] would have stipulated to knowledge of his felon status to prevent the jury from hearing evidence of his actual sentence"). Therefore, the district court's erroneous jury instruction on this issue was not plain error.

V

*A. Guidelines Calculation*

Willis contends that the district court erroneously calculated his Guidelines range when it found that, although he had been acquitted of the conspiracy and most substantive narcotics possession counts, Counts 3, 4, 10, and 11, he nonetheless, for sentencing purposes, possessed all the narcotics seized from 70 Henrietta and 45 Elm because he participated in jointly undertaken criminal activity with Pierce. Specifically, Willis argues that the government failed to meet its burden of proving jointly undertaken criminal activity between

Willis and Pierce by a preponderance of the evidence and that this failure was conspicuous insofar as the district court rested its finding on its conclusion that Willis possessed the drugs found at 45 Elm.

This Court has recognized that to hold the defendant accountable for jointly undertaken criminal activity, the district court must make two findings: "1) that the acts were within the scope of the defendant's agreement and 2) that they were foreseeable to the defendant." *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995). When applying these requirements, district courts look to (1) "whether the participants pool[ed] their profits and resources, or whether they work[ed] independently"; (2) "whether the defendant assisted in designing *and* executing the illegal scheme"; and (3) "what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct." *Id.* at 575 (emphasis in original).

Even where a defendant is acquitted of a drug conspiracy, a court may consider as "relevant conduct" drugs distributed by co-conspirators in the course of the conspiracy. *United States v. Bell*, 795 F.3d 88, 105-06 (D.C. Cir. 2015). Acquitted conduct may be considered by the sentencing court so long as it is based on reliable information and is proven by a preponderance of the evidence.

*See United States v. Reese*, 33 F.3d 166, 174 (2d Cir. 1994); *United States v. Romano*, 825 F.2d 725, 728 (2d Cir. 1987).

Willis's contention that the district court improperly relied on the narcotics allegedly recovered by law enforcement at 45 Elm—and which he was acquitted of possessing—to find that he and Pierce engaged in jointly undertaken criminal activity has merit.[8] This is because the record evidence renders the testimony supporting this finding physically impossible and therefore inherently implausible.

Detective Carney testified that he and Detective Granville entered the interview room and "located the narcotics on the floor … on the side of the desk that Mr. Willis was sitting on" inside a "plastic baggy [that] appeared to have human feces on it." Willis App'x at 70. The detectives, however, did not submit the bag for DNA testing. Detective Carney further testified that after he and Detective Granville recovered the drugs, he obtained a search warrant for the

---

[8] Specifically, Detective Carney testified that he recovered about 3.08 grams of cocaine base and about 1.32 grams of heroin in yellow glassine envelopes—which were found only in the upper apartment attributed to Pierce—on the floor of the interview room where Willis was detained after arrest. Likewise, Detective Donovan testified that Pierce left cocaine base in blue glassine envelopes in his separate interview room, which matched the envelopes found in the lower apartment to which Willis held keys.

lower apartment at 3:35 PM and then went on to execute the search warrant. But the search warrant application submitted by Detective Carney did not include the fact that Willis dropped drugs in the interview room. Doc. 34, Exh. A. Moreover, Detective Granville testified that he was conducting surveillance in the trunk of his car at 70 Henrietta from the morning until 4:15 PM when he was notified that the narcotics unit—which included Carney—would arrive at the scene from 45 Elm. Detective Granville simply could not have been at 45 Elm during the relevant period and therefore could not have located the narcotics on the floor. It was therefore clear error for the district court to rely on this testimony to "confirm[] that the criminal activity was undertaken jointly by the co-defendants." Willis App'x at 135; *see Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004) (noting that testimony "may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it"); *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) ("Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.")

In a footnote, the district court stated that "even though the evidence may not have met the standard of beyond a reasonable doubt, it did constitute proof

by a preponderance of the evidence." Willis App'x at 135 n. 2. However nowhere, including during oral argument below, did the district court deal with the physical impossibility embedded in Detective Carney's testimony. *See Menefee*, 391 F.3d at 164 ("We have found a district court's factual findings to be clearly erroneous where the court has failed to synthesize the evidence in a manner that accounts for conflicting evidence or the gaps in a party's evidentiary presentation."). Additional record evidence renders this testimony implausible, including the fact that both defendants were searched when they were arrested and were handcuffed in the interview rooms when they were alleged to have discarded the narcotics.

It was therefore clearly erroneous for the district court to rely on the drugs found at 45 Elm to conclude that a preponderance of the evidence establishes that Willis conspired with his co-defendant Pierce to possess with intent to distribute and to distribute the drugs found upstairs at 70 Henrietta Avenue. In so finding, the district court clearly erred in cross-attributing the drugs found in the upper apartment when it sentenced Willis. The error requires a remand for resentencing and reconsideration of whether the government met its burden of

proving jointly undertaken criminal activity between Willis and Pierce by a

preponderance of the evidence, and if so, the scope of that activity.

*B. Concurrent Sentencing*

Guidelines § 5G1.3(c), provides that if "a state term of imprisonment is

anticipated to result from another offense that is relevant conduct to the instant

offense of conviction . . . the sentence for the instant offense shall be imposed to

run concurrently to the anticipated term of imprisonment." U.S.S.G. § 5G1.3(c).

Section 5G1.3(c) applied to Willis's federal sentencing. A state term of

imprisonment was anticipated to result from his pending New York weapons

possession charges and although at sentencing the district court acknowledged

that this conduct was relevant it failed to explicitly rule whether Willis's federal

sentence would run concurrently. Because section 5G1.3(c) was a pertinent

Sentencing Commission policy statement, the district court was required to take

it into account. *United States v. Cavera*, 550 F.3d 180, 188–89 (2d Cir. 2008) (en

banc) (citing 18 U.S.C. § 3553(a)(5)). But the only reference to whether Willis's

sentence would run concurrently came from Willis's counsel who stated on the

record that he understood that Willis's seven-year state sentence was "going to

run concurrent to whatever" sentence the district court imposed. Willis App'x at

37

157. Nowhere did the district court express a contrary intention; nevertheless, neither the transcript nor the written judgment confirms counsel's understanding that the sentence would be concurrent. Therefore, Willis's sentence is remanded to the district court to expressly rule whether the sentence will run concurrently with his state sentence.

## CONCLUSION

For the reasons stated herein, the judgment of the district court is AFFIRMED in part and VACATED in part. Willis's sentence is remanded for resentencing and clarification.