*United States v. Carter*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14ᵗʰ day of November, two thousand twenty-two.

PRESENT:
> JOHN M. WALKER, JR.,
> BARRINGTON D. PARKER,
> EUNICE C. LEE,
> *Circuit Judges*.

_____

UNITED STATES OF AMERICA,

    *Appellee*,

   v.           No. 21-1005

SHEQUILLE CARTER,

    *Defendant-Appellant*.

_____

| | |
|---|---|
| For Defendant-Appellant: | BARCLAY T. JOHNSON, *for* Michael L. Desautels, Federal Public Defender for the District of Vermont, Burlington, Vermont. |
| For Appellee: | ZACHARY B. STENDIG, (Spencer J. Willig, Gregory L. Waples, *on the brief*) *for* Nikolas P. Kerest, United States Attorney for the District of Vermont, Burlington, Vermont. |

Appeal from a judgment of the United States District Court for the District of Vermont (Crawford, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

### I.       Background

On October 31, 2019, Defendant-Appellant Shequille Carter was charged with possession with intent to distribute heroin, fentanyl, and 28 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(B).

The case proceeded to trial where evidence was offered that on August 21, 2019, Melissa Rouleau, a confidential source ("CS"), provided a tip to Drug Enforcement Agency Task Force Officer ("TFO") Christopher Matott that an alleged drug dealer, a black male named "John," later identified as Carter, was looking for a ride from Burlington to St. Johnsbury, Vermont and would be traveling in a grey Toyota Tacoma truck. Matott relayed this tip to other DEA officers who began surveilling the truck. TFO Dwayne Mellis observed the truck pull into the address he was surveilling in Winooski, Vermont and saw one white male, later identified as Neil Scichitano, and Carter exit the truck and return with a white female, later identified as Rouleau. The truck then traveled to St. Johnsbury where numerous law enforcement officials continued surveillance.

Special Agent Timothy Hoffman observed the truck stop at a known drug house in St. Johnsbury and saw Carter and Scichitano go into the house for approximately five minutes and then return. Hoffman contacted Vermont State Police Trooper Giancarlo DiGenova and directed him to make a traffic stop on the truck. After DiGenova observed the truck commit a minor traffic violation, he pulled over the truck and observed Rouleau and Scichitano in the front seats and Carter in the backseat. Upon approaching the truck, DiGenova asked the passengers if they had any drugs, guns, or currency. Carter replied that he had about $3,000 on his person.

DiGenova asked Rouleau to get out of the truck. DiGenova began speaking with Rouleau, and when he realized that Rouleau was potentially a CS, he informed her that he would "try to separate [her] from what's inside the car." Joint App'x 199. After this conversation, DiGenova returned to his car and turned off the dash cam. DiGenova then asked Scichitano, the driver and owner of the truck, to step out of the truck and for consent to search it. While Carter remained in the truck, DiGenova witnessed him move forward towards the front passenger side. DiGenova ordered Carter to put his hands on the headrest and asked what he was doing. Carter replied that he was searching for a lighter in Rouleau's purse. DiGenova ordered Carter out of the truck and searched him, recovering a lighter in his pocket and about $3,000.

DiGenova then searched the truck. In the center rear console he found a pair of gloves stuffed with what was later determined to be 41.8 grams of cocaine base and 13.9 grams of a substance containing heroin and fentanyl. DiGenova also seized a phone from the backseat. Scichitano was let go at the scene. Carter and Rouleau were arrested. However, Rouleau was later released without charges and was paid $500 for her work on Carter's case.

At trial, the Government offered Carter's post-arrest statement, in which he indicated multiple explanations for the $3,000, including that he had been working, that he recently received a settlement from a car accident, and that the money was from selling marijuana; photographs of the drugs found in the truck and the money seized from Carter; text messages from Carter's phone sent and received between August 17 and August 21, 2019, which purportedly referred to drug quantities and transactions; and text messages between Rouleau and Carter from the time period when the truck was searched in which Carter stated, "Don't let them search car please. I can't afford to go to jail," Joint App'x 244.

3

In its case-in-chief, the defense called a staff investigator at the Vermont Federal Defender's Office who testified that Carter had in fact received money from a settlement in a civil lawsuit. After deliberating for several hours over the course of two days, the jury returned a guilty verdict. Carter timely appealed. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

**II.  Discussion**

On appeal, Carter raises three arguments. *First*, Carter argues that the district court erred when it excluded information about Matott's disciplinary records from the police department, which evinced racist behavior and domestic assault charges that resulted in Matott's termination, and information regarding Scichitano's prior drug convictions. The district court excluded Matott's disciplinary records, finding they were not direct evidence as to Matott's beliefs and prejudices, and they did not go to the credibility of any witnesses testifying. Additionally, the district court excluded the prior drug convictions of Scichitano, who did not testify, finding that the convictions were offered as propensity evidence.

Carter now argues that district court's exclusion of this evidence was erroneous and hindered his defense. Although Matott did not testify, Carter argues, this evidence was highly relevant because Matott was essential to Carter's arrest and supported Carter's theory that Matott chose to incriminate Carter due to his racial animus. As he did at trial, Carter notes that three people were found in a truck with narcotics that day, but Carter—the only black person in the group—was the only one prosecuted. Additionally, Carter avers that evidence of Scichitano's convictions would have further supported his defense that the drugs did not belong to him and was proper evidence on motive, intent, or knowledge.

"We review the district court's evidentiary rulings for abuse of discretion." *United States v. Willis*, 14 F.4th 170, 185 (2d Cir. 2021). Even if an evidentiary ruling is erroneous, we will affirm if the error was harmless, *id.*, meaning that it is "highly probable that the error did not affect the verdict," *United States v. Stewart*, 907 F.3d 677, 688 (2d Cir. 2018) (internal quotation marks omitted). We assess the importance of improperly excluded evidence by considering:

> (1) the importance of the unrebutted assertions to the government's case; (2) whether the excluded material was cumulative; (3) the presence or absence of evidence corroborating or contradicting the government's case on the factual questions at issue; (4) the extent to which the defendant was otherwise permitted to advance the defense; and (5) the overall strength of the prosecution's case.

*Id.* Regardless of whether there was any abuse of discretion in the exclusion of the cited records, harmless error review defeats Carter's claim. Here, although Matott initiated the surveillance on Carter, he did not ultimately conduct the traffic stop or the search of the vehicle, undermining the overall importance of Matott to the Government's case. Moreover, while Carter was not able to introduce specific evidence of Matott's bias, the district court explicitly noted when ruling that "[c]ertainly, you can make that argument about which of the defendants got charged." Joint App'x 157. Thus, Carter was still able to offer this line of defense and did so throughout the trial. As Carter points out, defense counsel emphasized for the jury in summations that Carter—the only black person in the group—was the only one prosecuted and described implicit bias and its possible role in Carter's case. Additionally, although Carter was unable to admit Schichitano's drug

convictions, the defense successfully elicited through the cross-examination of Hoffman that Scichitano was a drug user.[1]

Finally, the Government introduced numerous text messages sent by Carter on August 21 and the days leading up to it that suggested Carter was planning to sell heroin and cocaine. Additionally, Carter sent an incriminating text to Rouleau when the truck was about to be searched. This electronic evidence weighed strongly in the Government's favor and suggested that the drugs were in fact Carter's. *See United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009) ("We have repeatedly held that the strength of the government's case is the most critical factor in assessing whether error was harmless."). Therefore, even assuming the district court erred in excluding Matott's disciplinary records and Scichitano's drug convictions, such error was harmless.

*Second*, Carter argues that the district court erred in denying his motion to suppress his statements because under the totality of the circumstances, including the ongoing ruse by law enforcement about Rouleau taking "the fall for the trafficking charge," the conditions of his interrogation, law enforcement's threat of incarceration, and Carter's race, the statements were involuntary. Joint App'x 205. "On appeal from a challenged suppression order, we review a district court's findings of fact for clear error, and its resolution of questions of law and mixed questions of law and fact de novo." *United States v. Kourani*, 6 F.4th 345, 351 (2d Cir. 2021) (citation omitted). In evaluating voluntariness, we consider, "the totality of the circumstances,

---

[1] Defense counsel also inquired about Scichitano's prior drug convictions, but Hoffman stated that he was unaware of Scichitano's criminal history.

including (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Id.* (internal quotation marks omitted).

Regarding voluntariness, Carter's most salient argument is that Hoffman's threat of continued detention improperly overbore his desire to remain silent. Before Carter was given *Miranda* warnings and after handing Carter a state-court citation for a felony state drug offense, Hoffman stated: "[Y]ou do have a Citation . . . but you may have a goal of leaving here tonight. And that's a possibility. You could still be lodged tonight based on this charge or I could call the Southern District of New York right now and speak to your Probation Officer and tell him what's going on here." Joint App'x 32. Hoffman then stated that he would like to have a conversation with Carter, and Carter was subsequently Mirandized and proceeded to answer questions.

"While 'coercive police activity' is a 'necessary predicate' to holding a confession constitutionally involuntary, a finding that police conduct is 'false, misleading, or intended to trick and cajole the defendant into confessing' does not necessarily render the confession involuntary." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (first quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), and then quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)). In assessing coercion, this Court has drawn the line between "vague promises of leniency for cooperation" and "[m]aterial misrepresentations based on unfulfillable or other improper promises." *Haak*, 884 F.3d at 410 (quoting *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (collecting cases)); *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002) ("vague promises of leniency for cooperation are just one factor to be weighed in the overall calculus and generally will not, without more, warrant a finding of coercion").

Although Hoffman's statements imply the possibility of leniency if Carter talked because they suggested that Hoffman would not contact Carter's probation officer if he complied, Hoffman's conduct did not render Carter's statements involuntary under the totality of the circumstances. Previously, this Court has held that statements made by an officer, including that "I'm not looking to mess with you, I'm not looking to come after you, but you gotta get on board or you, you shut your mouth and then the weight of the federal government is gonna come down on you," did not render statements involuntary. *Haak*, 884 F.3d at 412–13. Hoffman's statements here are considerably more benign. Whether or not race should be a factor in the voluntariness calculus, as Carter argues, that additional factor did not render Carter's statement involuntary.

Even assuming *arguendo* that the district court erred in admitting Carter's statements, we conclude their admission was harmless. Although the inconsistencies between Carter's statements to Hoffman (including that he was selling marijuana) and his text messages were highlighted by the Government at trial, ultimately these statements had minimal importance to the Government's case, especially in light of the Government's other evidence against Carter, as described throughout. *See United States v. Taylor*, 745 F.3d 15, 27 (2d Cir. 2014) (when considering whether erroneous admission of statement was harmless, this Court considers factors including "the overall strength of the prosecution's case" and "the importance of the wrongly admitted testimony"); *United States v. Bailey*, 743 F.3d 322, 342 (2d Cir. 2014) ("a court must consider the importance of the erroneously admitted exculpatory statements to the government's proof of guilt in order to assess harmlessness"). For these reasons, we conclude that admission

of Carter's statements "was harmless beyond a reasonable doubt." *Taylor*, 745 F.3d at 27 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)).

Finally, Carter argues that the district court erred by allowing a jury instruction on special investigate techniques (the "Anti-CSI Instruction"), which stated:

> Specific Investigation Technique Not Required.
> During the trial you heard testimony of witnesses and argument by counsel that the government did not utilize specific investigative techniques. For example, no fingerprints were taken. You may consider these facts in deciding whether the government has met its burden of proof, because as I told you, you should look to all of the evidence or lack of evidence in deciding whether the defendant is guilty. However, you are also instructed that there's no legal requirement that the government use any of these specific investigative techniques to prove its case. There's no requirement to attempt to take fingerprints, or that it offer fingerprints in evidence. Law enforcement techniques are not your concern. Your concern, as I've said, is to determine whether or not, on the evidence or lack of evidence, the defendant's guilt has been proved beyond a reasonable doubt.

Joint App'x 356–57. Because Carter did not object below, this claim is reviewed only for plain error. *See United States v. Polouizzi*, 564 F.3d 142, 153 (2d Cir. 2009). Carter avers that the Anti-CSI Instruction lowered the Government's burden of proof, violating Carter's Fifth Amendment rights, and that such an instruction was particularly harmful here because the defense's theory rested in part on the Government's absent witnesses, failure to investigate, and failure to preserve evidence.

This Court has rejected a challenge to a similar jury instruction, which stated, in part, that the Government's investigative techniques were irrelevant, finding the instruction legally sound and noting that "[t]he jury correctly was instructed that the government has no duty to employ in the course of a single investigation all of the many weapons at its disposal, and that the failure to utilize some particular technique or techniques does not tend to show that a defendant is not guilty

9

of the crime with which he has been charged." *United States v. Saldarriaga*, 204 F.3d 50, 52–53 (2d Cir. 2000) (per curiam).

Carter takes particular issue with the Anti-CSI Instruction's language that "[l]aw enforcement techniques are not your concern," however, this is akin to the language in *Saldarriaga* that the Government's techniques are irrelevant. Moreover, like in *Saldarriaga*, the district court properly explained that the jury should consider the evidence or lack thereof, and based on that, determine whether the defendant was guilty beyond a reasonable doubt. Because the district court properly instructed the jurors that specific investigative techniques are not required and that they should consider all of the evidence, or lack of evidence, to determine Carter's guilt, we find that the district court did not err, much less plainly err, in issuing the Anti-CSI Instruction.[2]

\* \* \*

We have considered Carter's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

---

[2] Carter argues that even if the three errors he has identified do not individually warrant reversal, the cumulative effect of the errors do warrant a new trial. Because we have identified no errors in Carter's trial, "we must reject [his] claim of cumulative error." *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013).