(INSTANCE COURT.)

## The WILLIAM KING—*Davis* et al. Claimants.

Under the embargo act of the 22d December, 1807, the words " an embargo shall be laid," not only imposed upon the public officers the duty of preventing the departure of registered or sea-letter vessels on a foreign voyage, but, consequently, rendered them liable to forfeiture under the supplementary act of the 9th of January, 1808.

In such case, if the vessel be actually and *bona fide* carried by force to a foreign port, she is not liable to forfeiture.

The court being of opinion, under the facts and circumstances of the case, that the capture under which it was alleged the vessel was compelled to go to a foreign port was fictitious and collusive; the decree of condemnation in the court below was affirmed.

APPEAL from the circuit court for the district of New-York.

A libel was filed against this vessel in the district court of New-York, March, 1809, for a breach of the act of the 22d of December, 1807, laying an embargo, and the several acts supplementary thereto, alleging, that she proceeded from Baltimore, without any clearance or permit, bound on a voyage

to Exuma, one of the Bahama islands, where she
took in a cargo of six thousand bushels of salt, with
which she returned to New-York. The claimants
admitted the fact of going to Exuma, and bringing
away the salt, but alleged that it was from neces-
sity; that the brig was regularly bound to Boston,
but, being captured soon after she left Hampton
Roads, by a British privateer, was sent to Jamaica,
where she sold the cargo of flour which she had on
board, the government of that colony not allow-
ing it to be brought off. That she then went to
Exuma.

The testimony in the case exhibits the following
summary: About the middle of October, 1808, the
vessel arrived at Baltimore from Boston. At Balti-
more she took on board a cargo of upwards of six-
teen hundred barrels of flour, and sailed again,
ostensibly for Boston, about the first of November.
On reaching Hampton Roads, she stopped a few
days, being, as was asserted, wind bound. While
there, a British privateer, of ten guns and twelve
men, called the Ino, arrived in the Roads. On the
eighth of the month the brig put to sea, the Ino fol-
lowing her. On the afternoon of the same day the
Ino captured her, within ten leagues of the shore,
putting a prize master and one man on board. The
vessels then proceeded for the West Indies. During
the voyage no attempt was made by the crew either
to retake the brig or to escape, though favourable op-
portunities were not wanting. Her crew consisted of
nine persons. After a short separation from the
privateer, the brig arrived off St. Nichola Mole.

1817.

The William
King.

Here the privateer joined her, and thence the two went to Kingston. No prize proceedings were instituted against the brig; but, on the contrary, the supposed captors relinquished all claim to their prize, on reaching Kingston. From Kingston she went to Exuma, as above stated. The district court, on the hearing, pronounced a sentence of condemnation. A decree of affirmance, *pro forma*, was entered in the circuit court, from which the cause was brought, by appeal, to this court.

March 4th.

Mr. *Hoffman*, for the appellants and claimants, stated, that this case was governed by the authority of the Short Staple;[a] the William King having sailed from Hampton roads in company with that vessel, and both were seized by the British privateer Ino, and compelled to go to the West Indies. The two cases are perfectly coincident in their circumstances, and restitution having been decreed in the case of the Short Staple, the same judgment must, consequently, be pronounced in the present case. He argued that the whole plan and system of the revenue laws indicated that it was not the legislative intention to cumulate a forfeiture of the ship (being a registered vessel) upon the penalty of the bond, which had been given for re-landing the cargo in the United States.

The *Attorney-General* and Mr. *Hopkinson*, contra. The court expressly overruled the point made as to

a 9 *Cranch*, 55.

the construction of the embargo laws, in the case of the Short Staple,[*] although that case was determined, on its peculiar circumstances by a majority of the court, in favour of the claimants. But the restitution of the Short Staple, on the facts of her case, forms no ground for the acquittal of the William King, even should the facts be precisely similar. Principles of *law* form precedents. But an inference from evidence is not conclusive as to *facts*, in another cause, whether the testimony be the *same*, or *different*; certainly not if it be *different*.

Mr. *Hoffman*, in reply, argued, that the court could not, without judicial inconsistency, decide this case differently from that of the Short Staple, unless there was some substantial and important difference in the facts of the two cases; that the opinion of a majority of the court was the opinion of the court, and a rule of conduct, whether formed upon an abstract point of law, or upon a mixed question of fact and law; and that to maintain the contrary position would be to assent to an assertion, which had been hazarded in another place, that the decisions of this court are not binding as legal precedents on themselves and on others.

[*] In delivering the opinion of the court in that case, Mr. Chief Justice MARSHALL stated that this point had "been pressed with great earnestness by the counsel for the claimants; but the court is not convinced that his exposition of the embargo acts is a sound one. On this point, however, it will be unnecessary to give an opinion; because we think the necessity under which the claimants justify their going into St. Nichola Mole, is sustained by the proofs in the cause." *9 Cranch*, 60.

Mr. Justice JOHNSON delivered the opinion of the court.

This case comes up on appeal from the circuit court of New-York. The vessel is the same which makes her appearance in the case of the Short Staple, decided in this court at February term, 1815; and it has been contended that the acquittal in that case is conclusive upon this.

But we think otherwise. It might with more propriety be contended, that had the hearing of this cause come on together with that of the Short Staple, the latter would have found much more difficulty in escaping. As it was, the division of the court, and the acknowledgment of the judge who delivered the opinion show, that the vessel in that case was " hardly saved." In the present cause there is very material evidence which did not appear in, and could not affect the former. We shall, therefore, dispose of this case altogether upon the evidence that is peculiar to it.

It will be recollected that this vessel, as well as the Short Staple, were libelled for a violation of the embargo act of the 22d of December, 1807, and the supplementary act of the 9th of January, 1808, the former of which enacts, " that an embargo shall be laid on all ships and vessels in the ports of the United States, bound on a foreign voyage," and the latter forfeits the vessel that shall proceed to any foreign port or place, " contrary to the provisions of this act, or of the act to which this is a supplement." As the majority of the court were of opinion that no offence was committed in the case of the Short Staple,

It was unnecesssary to express any opinion on the application of the law.  They, therefore, waived it.

But in this case it becomes necessary to lay down the following principles.  There can be no doubt that if the William King was carried off to Jamaica by actual force, it was an act which wanted the concurrence of the will, and, therefore, innocent.  But, whatever is done in fraud of a law is done in violation of it ; and if a vessel, with an original intention to go to a foreign port, complied with the requisition necessary to obtain a clearance on a voyage coastwise, this is but the device by which she eludes the force that would otherwise have prevented her departure from the port.  Was, then, the sailing to a foreign port a prohibited act under the embargo law to a registered or sea-letter vessel ?  If so, the commission of such an act was a cause of forfeiture under the act of January 9, 1808.  And here the only doubt is, whether the words, " an embargo shall be laid," operate any further than to impose a duty upon the public officers to prevent the departure of a registered or sea-letter vessel on a foreign voyage.  The language of the act is certainly not very happily chosen ; but when we look into the definition of the word *embargo* we find it to mean " a prohibition to sail."  Substituting this periphrasis for the word embargo, it reads " a prohibition to sail shall be imposed," &c. or, in other words, " such vessels shall be prohibited to sail ;" which words, had they been used in the act, would have left no scope for doubt.

The only facts which it will be necessary to no-

1817.

The William
King.

tice in this case, in order to show the grounds of our decision, are these:

The Ino, the supposed capturing vessel, sailed from Guernsey for Boston in September, 1808. She bore an English commission, and is commonly called a British privateer. But as there exists no distinction, that we know of, between a privateer and letter of marque but what results from their equipments and habits; and as, although she mounted ten guns she had but twelve men, and confessedly came to Boston for a cargo, we are induced to think that her habits were rather commercial than roving. These three vessels lay in Boston harbour some time together. The two brigs sailed within a few days of each other, bound to Baltimore for a cargo of flour, and the Ino sailed soon after. As the embargo prevented her taking in a cargo, as such, the master cleared out for the Cape of Good Hope, and was permitted to take in a large stock of provisions as for a long voyage. But the master admits that he was, in fact, bound to Jamaica, and sailed for that port, and *affected* to be destined to the Cape in order to get permission to take in a large stock of provisions, because he knew provisions in the West Indies to be dear. In the mean time, the two brigs had taken in a cargo at Baltimore, and cleared out for Boston. But, as they allege, on account of contrary winds, they put into Hampton Roads, where they remained from the 1st of November to the 8th of the same month. Whilst the two brigs lay in Hampton Roads, the Ino also put into the same port, and the reason alleged for doing so

is, that after leaving the port of Boston she encountered high winds, which carried away her main-boom, and finding herself in the latitude of the Capes of Virginia, she put in to obtain a spar for a boom. But it is not a little remarkable here, that both Betts, the lieutenant of the Ino, and Southcote, the owner, who was on board, agree that the prevailing winds were north and west. And how a vessel bound from Boston to Jamaica, a course nearly south east, should, after several days under high north-westerly winds find herself in the latitude of the Capes of Virginia, seems unaccountable, unless we suppose that she was beating up, with intent to touch at Norfolk, instead of bearing away for her port of destination.

Three days after the arrival of the Ino the two brigs sailed; the Ino immediately pursued, over-hauled them before night, put a prize-master and one man on board the William King, a prize-master and two men in the other, and ordered them for Jamaica, with instructions to rendezvous at St. Nicholas Mole if separated. Being overhauled on this voyage by the Garland frigate, the Ino fled, and the brigs were examined. But being liberated, they proceeded to Cape Nicholas Mole, where the Ino joined them, and leaving the Short Staple there, the Ino and this vessel proceeded off Jamaica. Off that place the Ino restored a man which she had taken from the William King, and putting also the owner, Southcote, into her, she bore away, whilst the William King entered the harbour of Kingston. There she was given up to the master, who, as it is

alleged, was refused permission by the government to sail with his cargo, was obliged to sell it, and obtained about twenty dollars clear per barrel for what had cost five or six dollars at Baltimore.

So far the evidence stands unimpeached; it constituted, in fact, the defence of the claimant. But, at the trial below in this cause, a witness was produced in behalf of the prosecution, of the name of Gustaff Forsberg, who went out mate of the William King, and who, among a variety of facts, testifies to the following:

That when the William King sailed from Boston she carried off a Vineyard pilot, not having been able to land him; and that previous to her leaving Baltimore, this pilot was put on board the Federal George, Captain Field, then taking in a cargo of flour for Boston, with a request from the master of the William King, to return him to Boston, and the brig then sailed without a Boston pilot.

That, after putting into Hampton Roads, the masters of the two brigs went up to Norfolk, and did not return until the evening before they sailed; that this was the true cause of their detention in that port, as vessels went to sea whilst they lay there, and the winds would have admitted of their doing the same.

That, after the capture by the Ino, this witness intimated his intention to do no more duty, as he was then a prisoner; and was prevailed upon by the master to return to duty, by having his wages raised from nine to twenty dollars, which alteration was entered on the shipping articles.

That the man put on board with the prize-master was called Colonel Kirkland, was not a seaman, and that Captain R. Daniel, of the William King, still navigated the vessel, the prize-master exercising no authority, and this witness keeping the log-book, under the directions of the captain.

That at sea, in calm weather, the master and owner of the Ino, and the masters of the two brigs, met and amused themselves in each others vessels ; that, on their sailing from Jamaica, they took on board a number of articles, some of which were marked *Ino ;* that Southcote, the owner of the Ino, came out with them as passenger; that the day after they left Kingston they fell in with the Ino, and put on board of her her owner, and the articles taken on board at Kingston, with the exception of certain parcels of bagging which they took out with them to Exuma for the purpose of taking in salt.

And, lastly, that after their arrival in New-York, the master decoyed him on board a packet, and hurried him off, without his clothes, to Boston, and particularly cautioned him to be on his guard to say nothing to any one but what had been entered on the log-book, and informing him that if he remained in New-York he would be put in jail.

It is evident that these circumstances, taken together, afford very ample ground for condemnation. There could be no reason urged for putting the Vineyard pilot on board another vessel which was not yet ready for sea, if the master of this vessel had really intended to return to Boston ; and abandoning their vessels for five or six days in Hampton

Roads, looks too much like waiting for the expected convoy; whilst leaving the navigation of this vessel, and the keeping of the log-book, to the original master and mate, presents a state of confidence inconsistent with all idea of hostility. And this confidence is further conspicuous in all the subsequent occurrences to which this witness testifies. Independently of his testimony, the case is loaded with suspicious circumstances, but his testimony leads to conviction.

Aware of this, the counsel for the claimants have contented themselves with attacking his credibility. But, after duly weighing all the circumstances insisted on in the argument, we are of opinion, that as to several material facts, his testimony pointed out the means of detection if it was not consistent with the truth. If the Vineyard pilot, for instance, was not put on board the Federal George, the pilot and the master of the George might both have been resorted to, to detect the falsehood. Or if the change of wages, from 9 to 20 dollars, did not take place, nothing was easier than to refer to the shipping articles themselves to disprove the fact. On settling his account with the owners, (the present claimants,) that document, or a copy of it, or a charge founded on it, would necessarily have been put in their possession. If the brig was not converted from the prize into the handmaid of the Ino, after leaving Jamaica, the owner and officers of the Ino, who appear to have been "nothing loath" to appear in behalf of this claim, could have been resorted to to deny it. And, if there was no foundation for the

1817.

The William
King.

charge of hurrying the witness off from New-York in the manner he has sworn to, it would have been easy for Captain Daniel to have resorted to witnesses to prove that he left that place under other, and what, circumstances, or if in a packet, to prove, by some one on board the packet, that there was no foundation for the story.

Admitting this last fact to be true, it casts suspicion over the whole conduct of Capt. Daniel, and lessens the weight of his testimony so far as it stands contradicted by this witness. This point was much considered, and admitted by this court in the case of the General Blake, which I find is omitted from the Reports of the last term.

Yet it cannot be denied, that the claimants have one very just ground for attacking the credibility of Forsberg. We do not attach much importance to his having omitted most of the facts sworn to on his ast examination, because it does not appear that he was ever interrogated to them, and he might well have been unconscious of their having any material bearing on the case. But, both in the protest at Jamaica, and on his examination in the district court, he swears that the detention in Hampton Roads was produced by contrary winds. Whatever objections may be made to the protest in this case, that he gave this evidence in the district court there could be no doubt. It is a feeble excuse for a witness to allege that he swore incautiously, or under the influence or instruction of any one, in whatever relation they may have stood to each other. The court, therefore, have hesitated upon the question whether they should

not, on this ground, reject altogether the testimony of this witness. And nothing has induced them to sustain it but the consideration that, on all other points, the testimony itself pointed to the means of its own detection, and, on this point, it is not very material if it be true, as he swears, that the master was all the time at Norfolk, without the ship's boat, instead of being on board to take advantage of the first wind that offered.

This circumstance shows but little anxiety on the subject of the wind, and leads to the supposition, that some other object sanctioned this detention in the eyes of his owner. If this fact, also, had not been true, although the course of the winds could not, with much facility, have been proven, there could have been but little difficulty in proving the falsehood of such a charge relative to a voyage which was so much a subject of conversation at that time.

Upon the whole, the court are of opinion that the capture was fictitious, and that the decision below must be affirmed.

Decree affirmed.