# IN THE COURT OF APPEALS OF IOWA

No. 23-0948
Filed February 7, 2024

IN RE THE MARRIAGE OF SARA BETH KISTING
AND MATTHEW MICHAEL KISTING

Upon the Petition of
SARA BETH KISTING n/k/a SARA BETH BAHL,
    Petitioner-Appellee,

And Concerning
MATTHEW MICHAEL KISTING,
    Respondent-Appellant.

_____

Appeal from the Iowa District Court for Dubuque County,
Monica Zrinyi Ackley, Judge.

Matthew Michael Kisting appeals the order modifying his dissolution decree.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

Stuart G. Hoover of Alliance Law Office, East Dubuque, Illinois, for appellant.

Myia E. Steines of Clemens, Walters, Conlon, Runde & Hiatt, L.L.P., Dubuque, for appellee.

Bridget L. Goldbeck of Hughes & Trannel, P.C., Dubuque, for minor children.

Heard by Bower, C.J., and Greer and Chicchelly, JJ.

**CHICCHELLY, Judge.**

Matthew Michael Kisting appeals the modification of the decree dissolving his marriage to Sara Beth Bahl. He challenges the decision to grant physical care of the parties' children to Sara and contends the court interfered with his parental rights in violation of both the United States and Iowa Constitutions. He also challenges the award of Sara's trial attorney fees. Finally, Sara requests an award of appellate attorney fees. Upon our de novo review, we affirm the modification of the dissolution decree but vacate the provisions allocating sole decision-making authority to Sara. We find the district court did not interfere with Matthew's constitutional or parental rights. Finally, we decline to consider his challenge to Sara's award of trial attorney fees and further award her appellate attorney fees.

### I.      *Background Facts and Proceedings.*

The parties' marriage was dissolved in 2016. In the decree, both parties were granted joint legal custody and joint physical care of their two children: L.R.K., born in 2009; and S.J.K., born in 2011. The decree adopted the parties' stipulation, which determined the children's expenses, religious participation, and education. Before the dissolution, the children attended the Holy Family Catholic School, and Matthew and Sara stipulated they would split expenses for the children to continue to attend private Catholic school. Despite the stipulation, Sara paid the entire tuition for both L.R.K. and S.J.K.

Since the dissolution, the parties' relationships and circumstances have changed. Sara remarried in 2017 and moved to Dubuque.[1] Her husband, Josh, has two children from a previous relationship. Matthew continues to live in the marital home and has been engaged twice. His current fiancée, Brittni, has three children from a previous relationship. Matthew and Brittni are waiting to marry until her previous marriage is annulled and they can be joined in the Catholic faith. Following their union, Brittni desires to become a homemaker and homeschool all the children, including L.R.K. and S.J.K.

The catalysts for this action were two events, occurring in November 2021 and January 2022 respectively. First, in November, twelve-year-old L.R.K. was caught communicating with her "boyfriend," a male classmate from school. The conversations were conducted by email on L.R.K.'s school-issued computer while she was at Matthew's house and included age-inappropriate content.[2] Both Matthew and Sara were concerned about the content of these conversations as well as L.R.K.'s access to electronics, but they disagreed substantially on how to resolve these issues. Both parents use some form of supervision or controls during their parenting time, but they were unable to agree on whether L.R.K. should have a cell phone even with restrictions. They also fundamentally disagree on the purpose of dating or at what age their children should begin dating. Matthew's view is that his children may meet someone, preferably Catholic, at

---

[1] The district court was aware of Sara's relationship and plan to move to Dubuque at the time of the dissolution. Because these changes were contemplated at the time of the dissolution, we do not factor them into our analysis.

[2] We choose to be intentionally vague about the conversation to respect the privacy of the two minor children involved and because the content is not directly applicable to the appeal.

around seventeen and be married once they "became that serious" at eighteen or nineteen. Meanwhile, Sara sees "dating" at L.R.K.'s age as harmless because it generally just means "sitting next to each other in the lunchroom." She would prefer to monitor them *now* while they have less freedom and access to driving. Since this incident transpired, Matthew and Sara have argued about what happened and how to move forward. Matthew's communications with both Sara and the school district have dramatically deteriorated.

A second event that motivated this modification action occurred on January 1, 2022, when Sara arrived at Matthew's home to pick up L.R.K. and S.J.K. Before that day, Matthew and Sara had been arguing about whose parenting time it was. Believing she was entitled to the children during the New Year's holiday, Sara arrived at Matthew's that morning. She testified that before anyone answered the door, she heard the sound of Matthew cocking his gun. Upon opening the door, Matthew demanded Sara leave his property and threatened to remove her if she did not comply within ten seconds. When Sara did not leave, Matthew immediately grabbed her by the arm and dragged her off his porch. Sara sustained bruising on her arm from the contact.

After the incident, Sara contacted the Jackson County Sheriff's Office and the Iowa Department of Health and Human Services (HHS). Matthew testified she also reported him to the Iowa Department of Natural Resources with allegations of poaching. Three days later, Sara applied for relief from domestic abuse and was granted a temporary protective order. She further petitioned for modification, requesting physical care. On May 5, the court entered a permanent protective order, altering the physical-care arrangement to allow Matthew visitation with the

children every other weekend. This arrangement continued throughout the modification proceedings, and the parties attempted to communicate for the benefit of the children. Despite their efforts and the ongoing protective order, Matthew and Sara continued to engage in arguments from time to time.

In March 2023, Matthew recorded conversations with both L.R.K. and S.J.K., where he interviewed each child separately. In the conversations, Matthew shared documents from the domestic-abuse proceedings and the HHS assessment with the children. He also read to the children verbatim from the reports and asked them about the differences between the two households. A couple weeks later, this recording was admitted as evidence at trial, and L.R.K. testified she "lied the entire time" to avoid Matthew's "ranting."

The district court granted Sara's petition, maintaining joint legal custody but granting Sara physical care. Despite maintaining joint legal custody, the court gave Sara the authority to make all religious and educational decisions for the children. It also granted Matthew visitation and awarded Sara trial attorney fees. Finally, the court ordered the parties not to discuss the order or proceedings with the children. Matthew appeals.

## II.    Review.

We review modifications of dissolution decrees de novo. *See Thorpe v. Hostetler*, 949 N.W.2d 1, 4 (Iowa Ct. App. 2020). "While we are not bound by the fact-findings of the district court, we give them weight, especially as to credibility determinations." *Id.*

### III. Discussion.

Matthew contends that Sara failed to prove a substantial change in circumstances occurred since the date of the parties' dissolution, that the district court interfered with his parental rights, and it should not have awarded Sara attorney fees. Sara requests we award her appellate attorney fees. We review each argument in turn.

### A. Modification of Dissolution Decree.

Matthew argues that Sara failed to demonstrate the requirements to justify modification of the physical-care arrangement. "[O]nce custody of children has been fixed it should be disturbed only for the most cogent reasons." *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015) (quoting *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983)). The parent seeking modification bears the burden of proving (1) the circumstances have materially and substantially changed since the decree's entry and (2) the "ability to minister more effectively to the children's wellbeing." *Id.* (quoting *Frederici*, 338 N.W.2d at 158). Our primary consideration is not what is best for the parents but rather "what is best for the *child*." *Id.* at 34 (quoting *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007)).

First, Matthew contends that Sara failed to show a substantial change in circumstances occurred that would warrant modification and the district court improperly relied on the domestic-abuse allegations. The changed circumstances "must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary." *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016) (quoting *Frederici*, 338 N.W.2d at 158). We have

previously modified "when the parents simply 'cannot cooperate or communicate in dealing with their children.'" *Id.* at 441 (quoting *In re Marriage of Walton*, 577 N.W.2d 869, 870 (Iowa Ct. App. 1998)); *accord Hansen*, 733 N.W.2d at 700–01 (modifying joint physical care for parents with extreme differences in parenting styles and discipline); *In re Marriage of Swenka*, 576 N.W.2d 615, 617 (Iowa Ct. App. 1998) (granting physical care after the parents could not "cooperate and respect each other's parenting and lifestyles"). While the district court considered the allegations of domestic abuse, it primarily relied on the breakdown in Matthew and Sara's relationship to justify modification. Upon our own review, we agree that Matthew and Sara's ability to co-parent has deteriorated to the point that modification is warranted. The record is replete with the differences between Matthew and Sara's parenting and their inability to compromise. At the time of the dissolution, the parties were able to agree on the basics, such as the children's education and religious affiliation. Only two exceptions to this amicability stick out: (1) Matthew alleging Josh committed child abuse at the children's soccer game; and (2) Matthew confronting Josh in the parking lot outside of a parent-teacher conference, furious that Josh was in attendance. Outside of these incidents, Matthew and Sara were generally able to communicate, even through their disagreements. This continued for much of their co-parenting until the events described previously. Especially after the physical-care arrangement was altered in May 2022, their communication has greatly deteriorated.

Today, the parties cannot agree on the most significant parenting decisions. Matthew wants the children to leave their private Catholic school while Sara wants them to maintain enrollment. Matthew staunchly disagrees with the current school,

finding it "a perverted and twisted form of 'Catholicism.'" During the proceedings, Matthew emailed several school officials, expressing his reservations with the policies and curriculum, including "Marxist propaganda," "women priests, denial of biblical miracles," and the events surrounding L.R.K.'s school emails. He also condemned the school's teaching that "masturbation was [ ] morally acceptable" and employing a teacher "consistently breaking her vows of modesty by jogging . . . in skin tight booty shorts and a sports bra." Instead, he wants the children to participate in "traditional Orthodox Catholic" homeschooling, with Brittni serving as their teacher. Matthew would also prefer to remove the children from any extracurriculars he considers "immodest" or immoral. In particular, he wants to remove L.R.K. from both volleyball and show choir based on the uniforms and costumes, dance moves, and music selection. In contrast, Sara prefers their current school and encourages the children to participate in these social activities, which L.R.K. and S.J.K. have expressed are important to them.

The parties' parenting styles also differ wildly. They are unable to agree on whether their children should be allowed even restricted access to cell phones or other devices. They cannot decide at what point their children should be allowed to start dating or what those relationships should look like. They further disagree on the basic roles of men and women. L.R.K. testified that Matthew believes women "should be like housewives" and encourages her to marry "right after my senior year." Matthew instructs L.R.K. to dress modestly through faith-based internet articles and encourages S.J.K. to participate in football as "a good, manly sport." Sara takes a more well-rounded approach, encouraging a variety of activities and viewpoints.

While both Matthew and Sara are Catholic, their individual religious beliefs drastically differ. Matthew adheres to more conservative Catholic views and is a follower of Father James Altman.[3] Matthew attends a Latin mass, where women traditionally wear a veil for modesty, while Sara attends a local Catholic mass. L.R.K. testified she does not like attending Latin mass because of the language barrier and strict confession requirements. While Matthew argues that he has always been Catholic and therefore this was contemplated by the original court, Sara disagrees. She testified that Matthew has become "extremist" since their dissolution. This has been extended to the schedules put in place for L.R.K. and S.J.K. at each parent's household. Both children participate in regularly scheduled after-school activities at Matthew and Sara's, but the similarities between the two homes generally stop there. At Sara's, the children have consistent chores and homework time mixed with downtime. They attend a conventional Catholic mass on Sundays. At Matthew's, this is taken one step further, where the children follow a rigorous regime of housework, exercise, and prayer. Matthew also observes a strict Sunday Sabbath, which generally includes worship services and fellowship and excludes work activities.

In its order, the district court recognized the conflict in the relationship and addressed it. For example, it included a provision designating Sara to make all religious and educational decisions, likely given the parties' inability to agree. It is not up to our court to "favor one religion over another in a custody determination."

---

[3] Father Altman is a Catholic priest of the La Crosse Archdiocese. He was removed from his previous position as parish priest and currently has a YouTube channel where he shares his teachings, which Matthew has viewed with the children.

*In re Marriage of Decker*, 666 N.W.2d 175, 179 (Iowa Ct. App. 2003) (citation omitted). *But cf. In re Marriage of Anderson*, 509 N.W.2d 138, 141 (Iowa Ct. App. 1993) (finding positive values stemming from religious practice favor granting physical care). We respect Matthew's right to practice the religion of his choosing. *Decker*, 666 N.W.2d at 179. But the district court's lack of confidence in their ability to make basic religious decisions and the high level of conflict between the parties support a finding that there has been a substantial change in circumstances since the court entered the original decree.

We further find Sara established herself as the parent who is better able to meet the children's needs.[4] "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695 (citations omitted). Again, our primary focus is the best interests of the children. *Hoffman*, 867 N.W.2d at 34. While not controlling, we consider the history of caregiving to make this determination. *In re Marriage of Roberts*, 545 N.W.2d 340, 343 (Iowa Ct. App. 1996). Sara has historically been the primary caregiver for the children. She has generally been responsible for school registration, most appointments, and scheduling parent-teacher conferences. She encourages L.R.K. and S.J.K. to participate in school and community activities, and we have previously recognized the importance of extracurriculars for socialization. *See Harris*, 877 N.W.2d at 444 (finding one parent more suitable "based on her understanding of the children's needs for socialization through

---

[4] Matthew neglected to make any argument on this issue, and we therefore find it waived. *See* Iowa R. App. P. 6.903(2)(g)(3).

extracurricular activities"); *see also In re Marriage of Hubbard*, 315 N.W.2d 75, 82 (Iowa 1982) (granting physical care to the parent who "worked diligently to correct the educational deficiencies of his children" and involved them in extracurriculars). The children are also bonded to her, and L.R.K. testified she wanted to live with Sara primarily with limited weekend visitation for Matthew. While not controlling, we do consider the children's wishes, especially when the child is of suitable age, intelligence, and maturity. *See* Iowa Code § 598.41(3)(f) (2022); *Hoffman*, 867 N.W.2d at 35. L.R.K. was a bright fourteen-year-old at the time of the proceedings, and we do consider her desire to live with Sara in our analysis.

The Iowa Code also requires the parent awarded primary physical care to "support the other parent's relationship with the [children]." Iowa Code § 598.41(5)(b). Sara is capable of fostering the relationship between Matthew and the children. The record clearly shows her willingness to communicate with Matthew regarding the children's needs. She provides regular updates about the children's health and well-being and keeps him aware of their events and school activities. She has been supportive of L.R.K. and S.J.K. bonding with Matthew and his family, and she has attempted to share holidays based on Matthew and Brittni's schedules.

Based on past performance, Matthew is unable to reciprocate. When the protective order prevented both parents from being able to attend L.R.K.'s show choir event, Sara attempted to split the two performances so each parent could watch her. Matthew told Sara he would be attending both performances, telling her he would "immediately call the police" upon seeing her. More disturbing, Matthew has been discussing the parties' legal proceedings with L.R.K. and S.J.K

in a way that is not age appropriate. He has shared court documents with the children and made disparaging comments about Sara. He has bluntly discussed their dissolution and alleged that her infidelity was the reason for their divorce. During his visitation time, Matthew has had the children watch videos about Father Altman's teachings; the flaws of the judicial system and its preference for mothers who make domestic-abuse allegations; and the rise of toxic masculinity and need for male father figures and mentors. These were accompanied by discussions of the videos and included materials and statistics about the outcomes of children coming from "fatherless homes." Matthew directly involved the children in the proceedings when he made recorded interrogations of them, which he offered into evidence. In the recordings, Matthew coached L.R.K. and S.J.K., using leading questions until he received responses that he wanted. He read some of the domestic-abuse allegations verbatim and encouraged the children to tell him these statements were false. This behavior was not lost on the district court, which filed a supplemental order after the modification that directed the parents to not discuss the proceedings with the children. Based on these circumstances and Matthew's conduct, we find it is likely that granting physical care to Matthew would isolate the children from Sara, while the reverse would allow the children to have a relationship with both parents.

Because a substantial change in circumstances occurred justifying a change in the physical-care arrangement and because Sara is better able to meet the best interests of the children, we affirm the modification.

*B. Alleged Interference with Parental Rights.*

Next, Matthew argues the district court violated his constitutional rights in its modification order by restricting Matthew's parental rights. He first challenges the district court's order as a violation of his religious freedoms. *See* U.S. Const. amends. I, XIV; Iowa Const. art. I, § 3 (preventing the United States and Iowa legislatures from "respecting an establishment of religion, or prohibiting the free exercise thereof"). Despite awarding the parties joint legal custody of the children, the district court's order provided, "All education and religious decisions shall be made by [Sara]. The children cannot be made to attend Latin mass with [Matthew]." Matthew argues this prevents him from exercising his own beliefs and bringing up his children in his preferred faith.

Upon our review, we conclude it is unnecessary to reach Matthew's arguments concerning constitutionality because we are required to vacate this portion of the court's order for other reasons. "The [Iowa Code] does not permit an unequal distribution of decision-making authority, or an unbundling of decision-making authority, when both parents retain joint legal custodian powers." *In re Marriage of Sokol*, No. 21-1918, 2022 WL 3440256, at *3 (Iowa Ct. App. Aug. 17, 2022) (concluding Iowa Code sections 598.1 (defining legal custody) and 598.41(2)(b) (regarding legal presumption in favor of joint legal custody) do not permit inequal participation in decision-making by parents with joint legal custody), *aff'd in part and rev'd in part*, 985 N.W.2d 177, 187 (Iowa 2023) (affirming "the court of appeals modification of the custodial provisions of the decree"); *accord In re Marriage of Frazier*, ___ N.W.2d ___, ___, 2024 WL 132508, at *2 (Iowa 2024) (treating the statutory definition of "joint custody as an all-or-nothing

proposition" with equal shares of legal rights); *In re Marriage of Makela*, 987 N.W.2d 467, 471 (Iowa Ct. App. 2022) (concluding "the statutory definition of 'joint legal custody' leaves no room for a parceling of rights"). Because the district court gave Sara unilateral decision-making power without modifying legal custody, we cannot consider this issue on appeal[5] and must vacate this portion of the order. The parties must be given equal rights in legal custody decisions, including "the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(3). Therefore, we vacate any provisions that contradict with the parties' joint legal custody status.

Matthew also alleges that limiting visitation and communication with the children further violates his constitutional rights. He specifically cites the district court's provisions allowing L.R.K. to disrupt his visitation, the court's recommendation that Matthew and L.R.K. seek counseling, the continued representation of the children by their trial attorney, Sara's privilege to communicate with the children during his visitation time, and required mediation should other issues arise. He also challenges the supplemental order, which prevents him from discussing the modification proceedings with the children. The district court's primary considerations in its order were the children's best interests and the parties' declining communication. Our authority "is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience." *In re A.O.*, No. 01-1445, 2002 WL 1973910, at *4 (Iowa Ct. App. Aug. 28, 2002) (quoting *Prince v. Massachusetts*, 321

---

[5] Neither party requested a change in legal custody as part of the modification. Thus, this issue is not before our court on appeal, and we cannot consider it.

U.S. 158, 166 (1944)). We may "override the parents' qualified right to control the upbringing of their children," particularly when "harm to the physical or mental health of the child" is established. *Id.* at *5 (quoting *City of Panora v. Simmons*, 445 N.W.2d 363, 369–70 (Iowa 1989)). Like the district court, we have concerns about the level of conflict between the parties and the "disruptive effect" it imparts on the children. *See Harris*, 877 N.W.2d at 441. This level of conflict can have detrimental impacts on the children's well-being, and a modification may prevent such harm. *See id.* (noting children will inevitably become aware of parents' disharmony). We further find each provision is intended to develop L.R.K.'s and S.J.K.'s emotional, social, and physical health and to protect their interests. We therefore find no unlawful interference with Matthew's parental rights or violation of his constitutional rights.

Though our allocation of physical care of the children to Sara does not deprive Matthew of his "[r]ights and responsibilities as joint legal custodian . . . to equal participation in decisions affecting the child[ren's] legal status, medical care, education, extracurricular activities, and religious instruction," Iowa Code § 598.41(5)(b), in this case we find it necessary to stress the parents' ongoing mutual responsibility to cooperate in the best interests of their children. Our decision to modify the joint physical care provisions of the decree is compelled by the parents' failure to cooperate and communicate in addressing the needs and best interests of the children. Matthew has behaved as though by disputing an issue concerning the children, then that decision is resolved in his favor and is absolute. We caution Matthew that this approach not only ignores the spirit and intent of joint legal custody, but also what may be in the best interests of the

children. *See Frazier*, 2024 WL 132508, at *3 (holding when parents are in conflict regarding a joint decision, the "all-or-nothing statutory definition of joint legal custody . . . favor[s] the status quo"). If the modification ordered here does not achieve more mature and cooperative parental communication and decision-making by *both* parents in furtherance of the best interests of the children, the remedy of sole legal custody remains an option in any future modification proceedings. *See* Iowa Code § 598.41(2)(b) (providing if joint custody is not ordered, "the court shall cite clear and convincing evidence . . . that joint custody is unreasonable and not in the best interest of the child to the extent that the legal custodial relationship between the child and a parent should be severed"); *Walton*, 577 N.W.2d at 871 ("The court cannot order an awakening by the parties . . . . This is something [the parents] must do on their own."); *In re Marriage of Garvis*, 411 N.W.2d 703, 707 (Iowa Ct. App. 1987) ("[W]hatever discord that may exist between [divorced parents] must end when the well-being of their children is involved."); *see also Harris*, 877 N.W.2d at 444.

### C. Award of Trial Attorney Fees.

Matthew also challenges the district court's award of trial attorney fees to Sara and the assessment of the fees for the children's attorney. The Iowa Code allows the district court to "award attorney fees to the prevailing party in an amount deemed reasonable by the court" in a modification action. Iowa Code § 598.36. The district court is given "considerable discretion" in determining a trial attorney fee award. *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013). Accordingly, we review the award of trial attorney fees for an abuse of discretion. *See id.* at 635. We will overturn an award only if "it rests on grounds that are clearly

unreasonable or untenable." *In re Marriage of Erpelding*, 917 N.W.2d 235, 238 (Iowa 2018) (quoting *In re Marriage of Kimbro*, 826 N.W.2d 696, 698 (Iowa 2013)).

In making its determination, the district court referenced section 598.36 and granted attorney fees to Sara based on her success on the merits, but it did not determine a set amount. *See* Iowa Code § 598.36 (permitting an award of trial attorney fees for the "prevailing party" of an action). Instead, the court directed Sara to submit an affidavit of those fees within ten days, and it would "enter a separate order for judgment thereon." While Sara's counsel submitted the relevant affidavit, we have no record that an order was ever entered, and therefore this challenge is premature. *See* Iowa R. App. P. 6.103(2) ("The district court retains jurisdiction to consider an application for attorney fees notwithstanding the appeal of a final order or judgment in the action. If the final order or judgment in the underlying case is also appealed, the party appealing the attorney fee order or judgment shall file a motion to consolidate the two appeals."); *see also Schwickerath v. Anderson*, No. 21-1465, 2022 WL 17481857, at *10 (Iowa Ct. App. Dec. 7, 2022) (requiring party "to separately appeal the award of attorney fees to bring that matter before us for review"). Further, because Matthew failed to file a secondary appeal or request the two appeals be consolidated, we cannot consider his challenge.

*D. Award of Appellate Attorney Fees.*

Finally, Sara asks us to also award her appellate attorney fees. An award of appellate attorney fees is not a matter of right but rests in this court's discretion. *See In re Marriage of Towne*, 966 N.W.2d 668, 680 (Iowa Ct. App. 2021). Our "controlling consideration" is the parties' relative financial positions, but we also

consider the merits of the appeal and "whether a party has been obliged to defend the trial court's decision on appeal." *Michael*, 839 N.W.2d at 639. While each party has some financial resources to pay their respective attorney fees, Sara makes $20,000 less annually than Matthew. Sara is also the prevailing party in this action. Under these circumstances, it is appropriate to award Sara appellate attorney fees. But because she has not provided an affidavit of attorney fees with documentation to support her request, we remand to the district court to determine the amount of Sara's appellate attorney fees and enter judgment against Matthew in a reasonable amount. *See Towne*, 966 N.W.2d at 680 (remanding for the district court to calculate "reasonable and necessary fees" incurred on appeal).

## IV. Disposition.

Because it is in the best interests of the children, we affirm the modification but vacate the portion designating Sara as the sole decision-maker for religious and educational matters. We find the district court did not interfere with Matthew's constitutional or parental rights. Finally, we decline to consider Matthew's challenge to Sara's trial-attorney-fees award as premature, and we award Sara appellate attorney fees.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**