23-6175-cr
United States v. Huggins Orelien

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2023
No. 23-6175-cr

UNITED STATES OF AMERICA,
*Appellee*,

*v.*

HUGGINS ORELIEN, AKA SEALED DEFENDANT 1,
*Defendant-Appellant*.

Appeal from the United States District Court
for the Southern District of New York

ARGUED: MAY 28, 2024
DECIDED: OCTOBER 3, 2024

Before: NEWMAN AND MERRIAM, *Circuit Judges*, AND KATZMANN,[*]
*Judge*.

---

[*] Judge Gary S. Katzmann, of the United States Court of International Trade, sitting by designation.

Appeal from a judgment of the District Court for the Southern District of New York (Richard M. Berman, District Judge) convicting and sentencing the Appellant for Hobbs Act offenses based on robbing a woman of proceeds from her prostitution business.

Appellant challenges (a) the sufficiency of the evidence to support the interstate element of the offenses and (b) a two-level increase in the offense level for obstruction of justice.

We affirm the convictions, but vacate the obstruction of justice enhancement and remand for a finding as to whether Orelien acted with "willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

---

ROBERT P. PREUSS (Camille M. Abate, *on the brief*), New York, NY, *for Defendant-Appellant*.

KEVIN MEAD (Marguerite B. Colson, Hagan Scotten, *on the brief*), Assistant United States Attorneys, *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Appellee.*

---

GARY S. KATZMANN, *Judge*:

On December 4, 2019, Defendant-Appellant Huggins Orelien ("Orelien") and a co-conspirator robbed a woman (the "Victim") at

gunpoint in a hotel room in the Bronx. Following a jury trial, Orelien

was convicted of Hobbs Act Robbery and conspiracy to commit

Hobbs Act Robbery, both in violation of 18 U.S.C. § 1951.[1] The U.S.

District Court for the Southern District of New York (Richard M.

Berman, District Judge) sentenced Orelien to two concurrent 96-

month terms of imprisonment, one for each count, followed by three

years of supervised release.[2] Orelien now appeals from the judgment

of conviction. He argues that (1) the evidence admitted at trial was

insufficient to satisfy the interstate commerce element of Hobbs Act

Robbery and that (2) the district court erroneously increased his

offense level by two levels pursuant to § 3C1.1 of the United States

---

[1] The Hobbs Act provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." *Id.* § 1951(a).

[2] The district court also ordered Orelien to pay a $200 assessment and $4,000 in restitution to the Victim.

Sentencing Guidelines (the "Guidelines") for obstruction of justice.

While we conclude that the evidence introduced at trial satisfies the Hobbs Act's interstate commerce element, we agree with Orelien that the district court did not support the two-level increase under § 3C1.1 with a sufficient finding that Orelien's obstruction of justice was intentional. Accordingly, we reject Orelien's sufficiency-of-the-evidence challenge and **AFFIRM** the convictions, but **VACATE** the obstruction of justice enhancement and **REMAND** for further proceedings consistent with this opinion.

## I.     Background

Relying in part on the Victim's eyewitness testimony, the Government presented the following facts at trial.[3]

The Victim worked as a prostitute. Orelien and his co-conspirator robbed the Victim in a Bronx hotel room after arranging a "date" with the Victim through her advertisement on a website

---

[3] These facts are not disputed on appeal.

called CityGuide. After meeting the Victim in the room, Orelien used duct tape to restrain the Victim and cover her mouth. Orelien sexually assaulted the Victim while the co-conspirator threatened her with a gun. Then, while the Victim remained restrained by the tape, Orelien and his co-conspirator ransacked the hotel room and took a number of the Victim's belongings. These items included about $4,000 in cash (which the Victim had earned through her prostitution business), credit cards, cell phones, and a watch. After about ten minutes, Orelien and the co-conspirator left the hotel room with these belongings. The Victim then freed herself from the duct tape restraints and used the room phone to call the hotel lobby. Hotel staff called the police.

Several months later, Orelien was charged by Indictment with three federal offenses: Hobbs Act Robbery, Conspiracy to Commit Hobbs Act Robbery, and Firearms Use, Carrying, and Brandishing in

5

furtherance of the Hobbs Act Robbery offense.[4]

Orelien was arrested in the early morning hours of September 15, 2020, shortly after leaving a party. Orelien appeared tired in the hours following his arrest and indeed appeared to fall asleep in a law enforcement interrogation room. Law enforcement officers conducted a post-arrest interview of Orelien. One of the officers asked Orelien how he felt, to which he replied, "I'm alright." Joint App'x at 83. The officer then asked Orelien "so you're good?" and Orelien answered "mhm." *Id.* The officer then read Orelien his *Miranda* rights (and was recorded doing so on video), and Orelien signed the following written statement:

> I have read this statement of my rights or it has been read to me, and I understand these rights. At this time I am willing to answer questions without a lawyer present. No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

---

[4] The Hobbs Act Robbery and Firearms counts of the Indictment also charge Orelien with aiding and abetting these substantive offenses, in violation of 18 U.S.C. § 2. *See* Joint App'x at 15-16.

*Id.* at 85. A few minutes later, the same officer asked: "You took something? When?" *Id.*[5] Orelien responded: "No, no, no. I'm not saying. I was drinking and I was off, and I was falling asleep." *Id.* Orelien proceeded to make a recorded statement that he was one of the two men who were in the hotel room with the Victim on the night of the robbery. Later that day, a Pretrial Services Officer interviewed Orelien and prepared a bail report in anticipation of Orelien's initial appearance.

On August 23, 2021, before trial commenced, Orelien moved to suppress his post-arrest statement on the ground that his waiver of his *Miranda* rights was ineffective. *See* Joint App'x at 64. This, Orelien argued, was because he could not understand the rights as they were being read to him on account of (1) his limited understanding of English and (2) the lingering effects of psychoactive substances he had

---

[5] This question is phrased in a way that suggests it was asked in response to something Orelien said, but the parties have not provided us with a full transcript of the interview—only the excerpts cited by the government in its brief in opposition to the motion to suppress.

7

consumed the night before the arrest. *Id.* at 65.

At a November 4, 2021, hearing on the suppression motion, Orelien testified under oath that on the night (or early morning hours) before the arrest, he had ingested half a pill of the opiate oxycodone while attending his girlfriend's late-night birthday party. When asked whether he had "ever had Oxycodone before" Orelien testified that the night of the party was his "first time trying it." Conf. App'x at 70. Orelien further testified that he had also consumed marijuana and shots of hard liquor that night.

The district court denied the suppression motion on January 12, 2022.

After a weeklong jury trial from July 11 to July 15, 2022, the jury found Orelien guilty of Hobbs Act robbery and conspiracy to commit Hobbs Act robbery.[6]

---

[6] The jury acquitted Orelien of possession of a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i) and (ii), and of aiding and abetting that offense in violation of 18 U.S.C. § 2.

At sentencing, the district court applied a two-level increase to the otherwise applicable offense level under the Guidelines for Obstruction of Justice, on the ground that Orelien "perjured himself when he discussed his drug use, among other things" at the suppression hearing. Conf. App'x at 145.

## II.     Jurisdiction and Standard of Review

This court has jurisdiction to hear this appeal from the district court's final decision under 28 U.S.C. § 1291 and 18 U.S.C. § 3231.

"We review preserved challenges to the sufficiency of the evidence *de novo* and unpreserved challenges for plain error." *United States v. Jimenez*, 96 F.4th 317, 324 (2d Cir. 2024) (citations omitted). Reversal for plain error requires the satisfaction of three mandatory conditions and the exercise of a discretionary remedy:

> [S]o-called "plain-error review"—involves four steps, or prongs. First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected

9

the appellant's substantial rights, which in the ordinary case means he must demonstrate that it "affected the outcome of the district court proceedings." Fourth and finally, if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Puckett v. United States*, 556 U.S. 129, 135 (2009) (internal quotation marks and citations omitted).

"A plain error is an error so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object." *United States v. Gore*, 154 F.3d 34, 43 (2d Cir. 1998) (internal quotation marks and citation omitted).

The "plainness" requirement "means that '[w]e typically will not find [plain] error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court.'" *United States v. Napout*, 963 F.3d 163, 183 (2d Cir. 2020) (quoting *United States v. Whab*, 355 F.3d 155, 158 (2d Cir.

2004)).

Even under the less deferential *de novo* standard that applies to preserved sufficiency challenges, "we ask whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  In performing this analysis, we are required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury's verdict." *United States v. Willis*, 14 F.4th 170, 181 (2d Cir. 2021) (internal quotation marks and citations omitted).

When an appellant challenges "the application of a specific sentencing enhancement, we give due deference to the district court's application of the Guidelines to the facts.  That said, we review issues of law *de novo*." *United States v. Pope*, 554 F.3d 240, 245 (2d Cir. 2009) (internal quotation marks and citations omitted); *see also, generally,*

11

*United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).

Even where an appellant raises an issue for the first time on appeal, "the plain error doctrine should not be applied stringently in the sentencing context, where the cost of correcting an unpreserved error is not as great as in the trial context." *United States v. Gamez*, 577 F.3d 394, 397 (2d Cir. 2009) (per curiam) (citation omitted). However, "we are particularly hesitant to disturb the [district] court's determinations when they are based on its evaluation of the credibility of witnesses." *United States v. Thai*, 29 F.3d 785, 814 (2d Cir. 1994).

## III. Discussion

Orelien argues that (1) the evidence admitted at trial does not satisfy the interstate commerce element of a Hobbs Act Robbery and that (2) the sentencing enhancement applied by the district court rests on nonexistent or improper findings as to willfulness and materiality.

### A. Interstate Commerce Element of the Hobbs Act

Orelien brings a sufficiency-of-the-evidence challenge to his

convictions for Hobbs Act Robbery and Conspiracy to Commit Hobbs Act Robbery. *See* 18 U.S.C. § 1951. He argues that the government failed to produce sufficient evidence to establish that the Victim was engaged in interstate commerce—or even in an act with a downstream *de minimis* effect on interstate commerce—at the time of the robbery. Orelien did not bring a Rule 29 motion challenging the sufficiency of the evidence at trial as to the interstate commerce element; the argument was therefore unpreserved,[7] and we review it only for plain error. *See* Fed. R. Crim. P. 52; *Puckett*, 556 U.S. at 135.

Conviction under the Hobbs Act "requires proof beyond a

---

[7] Orelien moved, before trial, to dismiss the Indictment pursuant to Rule 12(b)(3)(B)(v) on the basis that the government had not adequately alleged that the robbery affected interstate commerce. That motion was denied. Orelien did not raise the interstate commerce argument again until the instant appeal. The argument is thus unpreserved. *See United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001) (applying a plain-error standard of review where in the district court proceeding the "defendant failed to renew his motion for acquittal on [a certain] ground at the close of the defense case"). Orelien did make a Rule 29 motion to dismiss for insufficient evidence after the close of evidence, but that motion related solely to the Victim's credibility as a witness, an argument Orelien does not pursue on appeal, and in any event, he failed to renew that motion after the verdict was returned.

reasonable doubt of an effect on interstate commerce." *United States v. Lee*, 834 F.3d 145, 150 (2d Cir. 2016) (citing 18 U.S.C. § 1951(a)). Evidence that the target of the robbery is a business that trades in an item that "necessarily travels in interstate commerce" will generally suffice to establish the robbery's effect on interstate commerce. *Id.* at 153.

Where the target does not trade in such an item, the jurisdictional element can still be satisfied in any of the following circumstances:

> (i) where the victim directly participated in interstate commerce; (ii) where the defendant targeted the victim "because of her status as an employee at a company participating in interstate commerce"; (iii) where the assets of a company engaged in interstate commerce were, or would have been, depleted as a result of the harm or potential harm, respectively, to the individual victim; or (iv) where the defendant targeted the assets of a business engaged in interstate commerce rather than an individual.

*United States v. Rose*, 891 F.3d 82, 86 (2d Cir. 2018) (quoting *United*

14

*States v. Wilkerson*, 361 F.3d 717, 729 (2d Cir. 2004)).

We start from the premise that the Victim's prostitution business is the type of "economic activity"—that is, a "moneymaking endeavor"—that qualifies as "commerce." *Taylor v. United States*, 579 U.S. 301, 306–07 (2016); *cf. United States v. Morrison*, 529 U.S. 598, 613 (2000) (identifying a category of actions that "are not, in any sense of the phrase, economic activity"). The Victim testified that she regularly received money in exchange for her services, about $4,000 of which was stolen by Orelien and his co-conspirator in the December 2021 robbery. *See* Joint App'x at 195. Orelien acknowledges in his brief that the Victim ran an "individual business" to "render [prostitution] services." Appellant Br. at 18.

Whether the facts introduced at trial satisfy the Hobbs Act's interstate commerce element can be evaluated on either a categorical or an individual level. Under the first approach, we ask whether prostitution as a class of economic activity categorically affects

15

interstate commerce, such that any robbery that affects prostitution also necessarily affects interstate commerce. *See Lee*, 834 F.3d at 151–52; *cf. Taylor*, 579 U.S. at 309 ("As long as Congress may regulate [under the Interstate Commerce power] the purely intrastate possession and sale of illegal drugs, Congress may criminalize the theft or attempted theft of those same drugs."). Under the second approach, we ask whether the particular robbery in *this* case affected interstate commerce under the Government's depletion-of-assets theory. *See Rose*, 891 F.3d at 86. We affirm Orelien's conviction on only the second basis, and accordingly do not consider the merits of the first.

The district court did not err, let alone plainly, in entering a judgment of conviction on the basis of evidence that the Victim engaged in interstate commerce in conducting her prostitution business—such that targeting her affected interstate commerce, as required for a conviction under the Hobbs Act. This is because "any

16

rational trier of fact could have found" beyond a reasonable doubt that the charged robbery depleted assets from the Victim's prostitution business and that that business operated in interstate commerce. *Willis*, 14 F.4th at 181.

The Government's depletion-of-assets theory rests on the principle that "a robbery or extortion that depletes the assets of a business operating in interstate commerce will satisfy the jurisdictional requirement of the Hobbs Act by a minimal showing of effect on commerce." *United States v. Jamison*, 299 F.3d 114, 120 (2d Cir. 2002). This principle applies even where the targeted business belongs to and is run by only one person, *see id.* at 121, and also where the targeted business is illegal. *See Taylor*, 579 U.S. at 308. Under this theory, it is enough that the "the assets of a [business] engaged in interstate commerce were . . . depleted as a result of the harm . . . to the individual victim." *Rose*, 891 F.3d at 86 (internal quotation marks

17

and citation omitted).[8]

We conclude that there was sufficient evidence to support the interstate commerce element of the Hobbs Act offenses, under the Government's theory that the charged robbery depleted the Victim's business assets. This depletion affected her ability to conduct her prostitution business. The robbers took approximately $4,000 in cash that the Victim had earned through prostitution services. The loss of this cash, the jury could reasonably find, affected her ability to continue her business by rendering her unable to pay her business expenses, including the cost of hotel rooms, advertising on CityGuide, and maintaining her cell phone service. Furthermore, the Victim testified that she had a dedicated cell phone that she used only for her prostitution business—indeed, it was the phone used to schedule the "date" with Orelien and his co-conspirator that led to the

---

[8] The district court instructed the jury that it could find the interstate commerce element satisfied under this depletion-of-assets theory; Orelien did not object to that instruction, and does not challenge it on appeal.

robbery. That phone was also stolen in the robbery, hindering the Victim's ability to continue her business activities.[9]

Orelien argues that the robbery targeted the Victim as an individual and not as a business, and thus the Government's depletion-of-assets theory cannot prevail. *See* Appellant Br. at 16. Citing *United States v. Perrotta*, 313 F.3d 33, 36 (2d Cir. 2002), Orelien points out that the mere fact that a robbery victim is employed by a company that engages in interstate commerce does not mean that the robbery of the individual employee affects interstate commerce. But *Perrotta* is inapposite. Here, Orelien robbed the Victim under the pretext of a business transaction, stole cash that she had earned

---

[9] Orelien contends that this evidence is insufficient to support a conclusion that the Victim's prostitution activities affected interstate commerce, because there is no evidence that the Victim catered to out-of-state clients at the time of the robbery; rather, "her testimony indicated that she moved her activities to New Jersey in response to and after the robbery occurred." Appellant Br. at 18. Direct evidence of this sort, however, is not required to satisfy the Hobbs Act's interstate commerce element, and that element need not be proven with specific interstate transactions. *See United States v. Elias*, 285 F.3d 183, 189 (2d Cir. 2002) ("The jurisdictional element of a Hobbs Act violation may be satisfied by evidence demonstrating an indirect effect on interstate commerce.").

through her work for other clients, and deprived the Victim of both the assets she needed to continue that work and a key instrumentality of the business, her cell phone. This is quite unlike the scenario in *Perrotta*, where "[t]here was no evidence heard by the jury that proves [the victim's] direct involvement in interstate commerce, or that [the victim] was targeted for any reasons other than personal ones." *Id.* at 40.

Thus, viewing the evidence in the light most favorable to the government, a rational jury could conclude that the robbery had at least a *de minimis* effect on interstate commerce. *See Jones*, 30 F.3d at 285. We accordingly find no plain error in the conviction.

**B. The Obstruction Enhancement to Orelien's Sentence**

The Guidelines provide as follows:

If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2

levels.

U.S.S.G. § 3C1.1.[10] Orelien challenges the district court's application of this enhancement to his Sentencing Guidelines offense level. Because we agree that the district court did not make sufficient findings establishing that Orelien's obstruction of justice was *intentional*, we vacate the obstruction of justice enhancement and remand for further proceedings on that issue.

On September 15, 2020, the date of Orelien's arrest, Orelien met with a Pretrial Services Officer. The resulting Pretrial Services Report states that "[t]he defendant reported the following substance abuse, beginning at age 19," and displays the following chart (which Orelien reproduces in his brief):

| Drug Name | Frequency Used | Last Used |
|---|---|---|
| Cannabinoids | daily | 1 day ago |
| Cocaine | occasional | 2 months ago |
| Prescription Opiates | occasional | 1 month ago |

---

[10] Obstruction under this provision has been held to "include[] perjury committed during a suppression hearing*." United States v. Thompson*, 808 F.3d 190, 194 (2d Cir. 2015).

Conf. App'x at 137.

Then, on November 4, 2021, Orelien testified at a hearing on his motion to suppress certain post-arrest statements that he argued had been elicited without an effective waiver of his *Miranda* rights. At the hearing, Orelien had the following exchange with his defense counsel regarding the events of the night before his arrest:

> **Q.** Did there come a point in time when you took anything else, besides marijuana and shots of Hennessy?
>
> **A.** Yes.
>
> **Q.** Tell us about that.
>
> **A.** I invited my friend to a party. He came like 3:00 in the morning. And then he was telling me do I want to try this pill, they're called Oxycodone. Then he gave me half of the pill and I pop it. And then I started sweating and throwing up.
>
> **Q.** Had you ever had Oxycodone before?
>
> **A.** No, that was my first time trying it.
>
> **Q.** So how did you feel in terms of your head after taking the Oxycodone?
>
> **A.** Like, my head was spinning, spinning. I was not feeling good. I was not in my right state of mind. So I

22

needed to rest to get it out of my system.

**Q.** How was your body after taking the Oxycodone?

**A.** I feel my body was like, you could say squeeze, like somebody was squeezing me. I was sweating. I didn't feel good at all.

Conf. App'x at 69–70.

Finally, the Pre-Sentence Report ("PSR") reports that in his presence interview on August 26, 2022, Orelien "recalled that he tried oxycodone on one occasion when he was 18 or 19 years old" and "reported no subsequent use of oxycodone." *Id.* at 120.[11] Neither Orelien nor the government filed any objections to the factual statements in the PSR.

The district court found that these statements conflicted with one another, and determined by a preponderance of the evidence that Orelien gave "untrue, false testimony under oath during the course

---

[11] Orelien was represented by the same counsel at his presentence interview as conducted the examination of Orelien at the suppression hearing on these issues. *Compare* Conf. App'x at 1 (cover page of transcript identifying counsel for Orelien), *with* Conf. App'x at 117 (PSR stating that "[d]efense counsel was present during the [presentence] interview").

23

of a suppression hearing, and that those untrue statements were material to the Court's determination" of the suppression issues. *Id.* at 144; *see also* U.S.S.G. § 3C1.1. The district court stated as follows:

> In this instance, the defendant testified that he had taken half of a pill of oxycodone the night before he was arrested, and he claimed that it was the very first time he had ever taken oxycodone, which would suggest it had a particularly strong effect on him . . . . Those statements about oxycodone were, in my opinion, lies. In both pretrial services and the probation department interviews of Mr. Orelien about his use of oxycodone, in both cases, he denied to them taking oxycodone the night before his post-arrest interview.

Conf. App'x at 146. The district court also found that Orelien's "lies" were "material to my finding that the motion to suppress should be denied." *Id.* at 147. As a result, the district court applied a two-level increase under Guidelines § 3C1.1 for obstruction to the otherwise applicable base offense level.

Orelien argues that both of the district court's findings in support of the two-level increase were abuses of its enhancement discretion. He contends that (1) the district court did not support its

perjury finding with a specific finding that Orelien willfully offered untrue statements under oath; (2) the district court erroneously found that the Pretrial Services and Presentence Reports contradict Orelien's testimony at the suppression hearing; and (3) the cited testimony, even if untrue, was not material to the district court's consideration of the suppression motion.

We look to *United States v. Dunnigan* in determining whether the district court's obstruction enhancement passes muster.

> [I]t is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if, as was the case here, the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury.

507 U.S. 87, 95 (1993). In making such a perjury finding, the district court must in turn "find by a preponderance of the evidence that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *Thompson*, 808 F.3d at 194–95 (internal quotation marks and

25

citations omitted). "Willfully," in this context, means with "willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory," *Dunnigan*, 507 U.S. at 94, and "material" refers to any "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 cmt. n.6.

*Dunnigan*'s sufficient-findings requirement also has a constitutional dimension. The Court, in the course of rejecting an argument that the obstruction of justice enhancement is inherently unconstitutional, stated as follows:

> The concern that courts will enhance sentences as a matter of course whenever the accused takes the stand and is found guilty is dispelled by our earlier explanation that if an accused challenges a sentence increase based on perjured testimony, the trial court must make findings to support all the elements of a perjury violation in the specific case.

*Dunnigan*, 507 U.S. at 96–97. We elaborated on this point in *United States v. Pena*, explaining that if "a credibility determination, without more, automatically amounted to a finding of willful intent to

mislead, nearly every denial of a motion to suppress would support an enhancement for obstruction of justice." 751 F.3d 101, 106 (2d Cir. 2014). In *United States v. Lewis*, we noted that "the obstruction enhancement 'is not intended to punish a defendant for the exercise of a constitutional right,' and 'not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.'" 62 F.4th 733, 746 (2d Cir. 2023) (quoting *Pena*, 751 F.3d at 106 n.1).

### 1. *Truthfulness*

The district court did not err in finding by a preponderance of the evidence that Orelien's statements at the suppression hearing about his oxycodone use were untrue. Orelien's Pretrial Services Report dates his last use of "prescription opiates" to one month before the arrest,[12] and the Presentence Report dates Orelien's last use of

---

[12] The district court's reliance on the Pretrial Services Report report raises some concerns. The Report does not specifically mention "oxycodone," and at the time of the underlying interview, Orelien was coming off a long, sleepless night of substance abuse and police questioning. But read together with the Presentence Report, it reflects a pattern of denials of oxycodone usage that contradicts Orelien's sworn testimony at the suppression hearing.

oxycodone (a prescription opiate) to when he was 18 or 19 years old. Orelien testified at the suppression hearing that he had taken oxycodone at a party the night before his arrest and that the party had been his "first time trying it." Conf. App'x at 70.

Whichever version of events is true—the suppression hearing testimony or the information in either report in the record—the district court acted within its discretion in discrediting Orelien's sworn testimony in light of the contradiction. Such a credibility determination, while not "completely immune from appeal," is nevertheless owed "particularly strong deference." *Mathie v. Fries*, 121 F.3d 808, 812 (2d Cir. 1997) (internal quotation marks and citations omitted); *see also Thai*, 29 F.3d at 814.

Against this standard, we decline to disturb the district court's constituent finding, within the broader perjury inquiry, that at least one of Orelien's sworn statements was false. The direct contradiction among Orelien's own statements means that the district court's

28

finding that Orelien's statement at the suppression hearing about his oxycodone use was false is "plausible in light of the record viewed in its entirety." *Lewis*, 62 F.4th at 746 (internal quotation marks and citation omitted).

### 2. *Materiality*

Orelien also argues that his testimony at the suppression hearing "concerning his oxycodone use the night before his arrest" was not "material to his motion to suppress his statement." Appellant Br. at 28. Not so: Orelien's testimony was directly relevant to the district court's consideration of that motion, even though the court's ultimate disposition was denial. As the district court stated at the sentencing hearing, "[t]hat testimony was critical to the defendant's suppression motion and his claim, Mr. Orelien arguing that Mr. Orelien's subsequent waiver of his *Miranda* rights and subsequent statements were involuntary because of the . . . oxycodone . . . ." Conf. App'x at 146. In other words: Orelien testified that the lingering effects of the oxycodone he ingested at the party shortly before his

29

arrest rendered him incapable of effectively waiving his *Miranda* rights before he made incriminating statements to law enforcement.

Orelien's attempt on appeal to minimize the significance of his oxycodone-related testimony is undermined by his own representations to the district court. In his brief in support of his motion to suppress, Orelien asserted in Subheading "B" that "Lack of Sleep, Alcohol Intoxication, and Marijuana/*Oxycodone* Ingestion Prevented [Orelien] from Understanding His Rights." Joint App'x at 77 (emphasis added). Orelien invoked his purported oxycodone use to bolster the applicability to his case of the proposition that "[w]hen the interrogating officers should reasonably have known that a suspect was under the influence of drugs or alcohol, 'a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession.'" *Id.* (quoting *United States v. Haddon*, 927 F.2d 942, 946 (7th Cir. 1991)). It thus appears that Orelien intended his testimony regarding his oxycodone use "to influence or affect the issue under

determination." U.S.S.G. § 3C1.1 n.6. And as the district court noted, that testimony entered the district court's consideration as a factor weighing against denial.

We accordingly sustain the district court's sentencing determination insofar as it pertains to materiality.

### 3. *Willfulness*

The district court did not make findings on the willfulness prong of the perjury inquiry sufficient to satisfy the standard set out in *Dunnigan*. *See* Conf. App'x at 146. As previously noted, to support the obstruction enhancement based on perjury, a district court must make a finding "that encompasses all of the factual predicates for a finding of perjury." *Dunnigan*, 507 U.S. at 95. One of the factual predicates for a finding of perjury is willfulness—that is, the false testimony must have been given "with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* at 94; *see also United States v. Khedr*, 343 F.3d 96, 102 (2d Cir. 2003) ("[W]e have generally limited the application of the [§ 3C1.1

31

enhancement] to those cases in which the defendant had the specific intent to obstruct justice." (internal quotation marks and citations omitted)).

The district court did not directly state that Orelien acted with an intent to obstruct. Nor can we discern a willfulness finding, as distinct from an untruthfulness or materiality finding, from the statements the district court did make.

The district court began by reciting the correct standard for an obstruction enhancement—which includes a finding that a defendant *willfully* gave material and false testimony:

> [U]nder the guideline provisions, I am required to find the following: if a defendant wil[l]fully obstructed or impeded or attempted to obstruct or impede the administration of justice with respect to investigation prosecution, sentencing of the instant crimes, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct or to a closely related offense, increase the offense level by two, which is what I have done in doing the assessment.

Conf. App'x. at 144. The district court also cited *Thompson*, 808 F.3d at 190, for the proposition that "the standard is by a preponderance of

the evidence that the defendant wi[l]lfully and materially committed perjury, which is intentional giving of false testimony as to a material matter." Conf. App'x at 145.

Notably, however, the district court did not mention willfulness in its summary of its obstruction enhancement–related findings as applied to Orelien:

> I find that Mr. Orelien gave untrue, false testimony under oath during the course of a suppression hearing, and that those untrue statements were material to the Court's determination. So the obstruction of justice enhancement does apply by a preponderance of the evidence.

Conf. App'x at 144. Untruthfulness and materiality, however, are only two of the three required elements of a perjury finding.

We note passing references to the concept of willfulness at various points in the district court's analysis, but we identify no finding that the Orelien acted willfully.

The district court stated, for example, that Orelien's statements were "lies," and that "I agreed wholeheartedly with the government's

33

analysis of this enhancement contained in its letter to the Court of November 5, 2022." Conf. App'x at 145–46. In that letter submission, counsel for the United States argued that Orelien's sworn "statements about Oxycodone use were deliberate lies." Joint App'x at 583. "The defendant," the letter continued, "was interviewed by Pretrial Services in this case shortly after his post-arrest statement, and only hours after he had supposedly taken the Oxycodone pill." *Id.*

These references to the possible factual predicate of willfulness, however, are not findings that "encompass[]" it. *See Dunnigan*, 507 U.S. at 95.

The Court in *Dunnigan* did not explain precisely what it meant by "encompasses." *Id.* The Court stated that "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding" when imposing an increase under § 3C1.1. *Id.* But while the Court contrasted determinations that "encompass[] all of the factual predicates for a perjury finding" with those that

"address each element of the alleged perjury in a separate and clear finding," *id.*, "encompasses" in this context could plausibly refer either to implication or to explication.

Although we have yet to squarely parse the meaning of "encompasses,"[13] in this context, our precedents in related contexts guide our reasoning.

We have framed the requirement of a willfulness finding in

---

[13] Some circuits read *Dunnigan* to impose a strict discrete-explanation requirement. The Ninth Circuit has reasoned that "[t]o require explicit findings on elements needed for the obstruction of justice enhancement helps ensure reliability and reviewability of a sentencing decision." *United States v. Castro-Ponce*, 770 F.3d 819, 822–23 (9th Cir. 2014) (remanding where the district court stated only that the defendant "clearly lied on the stand with respect to the activities that he testified about"). The Sixth Circuit adopts a somewhat more flexible standard. *See United States v. Roberts*, 919 F.3d 980, 991 (6th Cir. 2019) (adverting to "*Dunnigan*'s independent-finding mandate" but observing that "while we sometimes insist on rigid adherence to these rules, other times we've affirmed on less work, so long as the record below is sufficiently clear to indicate those statements that the district court considered to be perjurious and that the district court found that those statements satisfied each element of perjury." (internal quotation marks and citations omitted)). The Seventh Circuit "has upheld obstruction enhancements in the absence of clear, individualized findings as to each element of perjury." *United States v. Johnson*, 612 F.3d 889, 893 (7th Cir. 2010). In those instances, despite an absence of "specific, separate findings" as to willfulness, the sentencing court "created a record that allowed this court to determine that each court specifically found the defendant lied about a material issue." *Id.* at 894.

different ways in our decisions. We have consistently held, however, that "before imposing the adjustment, the district court must *find* that the defendant *consciously* acted with *the purpose* of obstructing justice." *Thompson*, 808 F.3d at 195 (quoting *United States v. Agudelo*, 414 F.3d 345, 349 (2d Cir. 2005)) (internal quotation marks and citation omitted; emphases added); *see also United States v. Kelly*, 147 F.3d 172, 178 (2d Cir. 1998) ("[T]he court must find that the defendant's statements unambiguously demonstrate an intent to obstruct.").

We have also held[14] that a district court applying an obstruction enhancement on perjury grounds must at a minimum identify the specific untrue statement on which it bases the perjury finding. *See United States v. Rosario*, 988 F.3d 630, 634 (2d Cir. 2021) (per curiam) (collecting cases). In *Rosario*, we remanded for further findings in

---

[14] In one of our earliest glosses on *Dunnigan*, we rephrased the "encompasses" standard thus: "Although separate and clear findings on each element of perjury are preferred, a general finding of obstruction that *tracks* those factual predicates necessary to support a finding of perjury will suffice." *United States v. Shonubi*, 998 F.2d 84, 88 (2d Cir. 1993) (emphasis added) (citing *Dunnigan*, 507 U.S. at 95); *see also United States v. Harris*, 741 F. App'x 823, 827 (2d Cir. 2018) (summary order) (quoting *Shonubi*).

36

support of an obstruction enhancement on the following basis:

> [T]he District Court [did not] make the findings we have demanded. For example, the District Court did not identify the statements on which the perjury finding was grounded. Nor did it make explicit findings that defendant's testimony was intentionally false, or that Rosario knowingly made a false statement under oath. We see no discussion, let alone a finding, of whether Rosario consciously acted with the purpose of obstructing justice.

*Id.* at 633–34 (internal quotation marks and citations omitted; alterations adopted); *see also United States v. Hunt*, 82 F.4th 129, 142 (2d Cir. 2023) (quoting *Rosario*, 988 F.3d at 634).

Independently of the § 3C1.1 enhancement, we also require the sentencing court in all circumstances to "make findings sufficient to permit meaningful appellate review." *United States v. Norman*, 776 F.3d 67, 82 (2d Cir. 2015); *see also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking

37

authority.").

Finally, we have acknowledged at least one circumstance in which a district court may meet the *Dunnigan* standard without discretely explaining the basis for its willfulness finding. In *United States v. Lincecum*, we suggested that "[w]here the district court finds that the defendant has clearly lied in a statement made under oath, the court need do nothing more to satisfy *Dunnigan* than point to the obvious lie and find that the defendant knowingly made a false statement on a material matter." 220 F.3d 77, 80 (2d Cir. 2000) (internal quotation marks and citation omitted).

The nature of the record before us means that *Lincecum*'s obviousness holding does not directly control the outcome of this case.[15] At the same time, the holding dispels any notion that our

---

[15] This is because the district court in this case did not find that Orelien's statements at the suppression hearing were *obviously* intentional lies. Nor did the district court expressly find that Orelien's testimony regarding his drug use was so detailed that its untruthfulness must necessarily imply willful deceit. *See Pena*, 751 F.3d at 106 (2d Cir. 2014) (distinguishing *Lincecum* on the ground that "[t]he verisimilitude in the *Lincecum* statements (describing the when, where, and the

Circuit hews to a strict reading of *Dunnigan* whereby the district court must painstakingly explain its willfulness finding in all circumstances. We did not state in *Lincecum* (nor in any case applying *Lincecum*) that a finding of obviousness permits the sole viable exception to an otherwise universally applicable discrete-explanation requirement. To the contrary, we have disfavored such rigid requirements in the context of sentencing, which imposes "a responsibility heavy enough without our adding formulaic or ritualized burdens." *Cavera*, 550 F.3d at 193.

The basic principle we distill from our caselaw is that a district court's explanation of its perjury finding must somehow allow a reviewing court to discern the basis for the underlying willfulness finding. But while explanation helps us discern the basis for the enhancement, we will not always remand on the basis of its absence alone. It is possible that, if the district court identifies the untrue

response of the police) supported an inference that the affiant must either be telling the truth or committing perjury.").

39

statement that forms the basis for a perjury finding, and determines that the defendant intentionally offered that statement, the district court's willfulness finding may be discernible without being explicit—and thus may be affirmed.

In this case, the closest thing to a discernible willfulness finding is the district court's statement that Orelien's "statements about oxycodone were, in my opinion, lies." Conf. App'x at 146. But this does not indicate whether the district court believed that "lie" necessarily implies willfulness in this context, or that this particular "lie" was necessarily uttered with the intent to obstruct justice. *Cf. Lewis*, 62 F.4th at 748 (upholding an obstruction enhancement premised on an affidavit that the district court found, in addition to being "demonstrably false," "was categorical enough to admit of only one meaning and constituted a willful attempt to deceive the court as to a material issue").

Nor does the context of the district court's statement clarify

40

matters.  The statements that precede it amount to a finding on the separate element of materiality: "Mr. Orelien doubled down on that testimony on cross-examination.  That testimony was critical to the defendant's suppression motion and his claim . . . ."  *Id.*  And the statement that follows it ("In both pretrial services and the probation department interviews of Mr. Orelien about his use of oxycodone, in both cases, he denied to them taking oxycodone the night before his post-arrest interview.") is a finding on the separate element of untruthfulness.  *Id.*  In none of these statements do we discern a reviewable finding—to the extent the district court implicitly made such a finding by describing Orelien's statements as "lies"—that Orelien offered untruthful and material testimony *with the intent to obstruct justice.*  If these statements contain an implicit willfulness finding, it is not a finding that permits "meaningful appellate review."  *Norman*, 776 F.3d at 82.

This is because we can only speculate as to the reasoning

41

underlying it.  That reasoning could rest, for example, in the district court's observations with respect to materiality that "Mr. Orelien doubled down on that testimony on cross-examination" and that "[t]hat testimony was critical to the defendant's suppression motion and his claim . . . ."  Conf. App'x at 146.   Perhaps the district court meant to convey that the critical nature of Orelien's untrue testimony at the suppression hearing established a motive for Orelien to offer it.  Willfulness, in turn, might be inferred from the existence of this motive.

But while this line of reasoning might be cogent enough, we hesitate to read it into the district court's statements at the sentencing hearing.  This is because we are unwilling to attribute to the district court reasoning that could implicate the constitutional concern that the Supreme Court raised in *Dunnigan*, 507 U.S. at 96–97.   If willfulness could be inferred from every instance of testimony that is both untruthful and material, willfulness findings would be

superfluous—risking a scenario in which "nearly every denial of a motion to suppress would support an enhancement for obstruction of justice." *Pena*, 751 F.3d at 106. We accordingly do not allow the application of a "per se rule . . . that any time a court credits officer testimony over that of a defendant, the defendant must have given knowingly false testimony." *Thompson*, 808 F.3d at 196 (citing *Agudelo*, 414 F.3d at 349); *see also Dunnigan*, 507 U.S. at 96–97.

We do not suggest that the district court would be unable to address this concern. But without knowing how the district court would address it, we decline to read a willfulness finding into the sentencing hearing transcript we have before us.

This is not a matter of the district court's failure to incant magic words. *See Cavera*, 550 F.3d at 193. It is instead a matter of our inability on review to isolate a reasoned finding that Orelien's material and untruthful statements were also intentionally offered in a willful attempt to obstruct justice. We thus cannot discharge our

responsibility to conduct "meaningful appellate review" of the enhancement. *Norman*, 776 F.3d at 82.

The district court's willfulness finding in *Lincecum* provides an instructive comparison. 220 F.3d at 79. There, we upheld an obstruction enhancement that was supported by the following finding of willfulness:

> The affidavit was sufficiently detailed and quite clearly false. It was so detailed that I am persuaded by clear and convincing evidence that Mr. Lincecum when he signed it had to have known it was false . . . .

*Id.* (alterations omitted). This brief finding in *Lincecum* rested on the detailed nature of the defendant's sworn statement, and on the corresponding (stated) inference that a false statement of such detail could only be offered intentionally.[16] Here, by contrast, the district

---

[16] Other cases offer helpful examples of sufficient post-*Dunnigan* willfulness findings that did not include the word "willfulness." In *Kelly*, we found no error in the district court's application of an obstruction enhancement on the basis of the following finding, which accompanied separate findings on untruthfulness and materiality:

court did not state or otherwise discernibly imply that Orelien's statements at the suppression hearing were willful.

We accordingly remand to allow the district court to make a finding as to the willfulness (or lack thereof) of Orelien's untruthful and material statements.[17]  Specifically, the district court must make a finding as to whether Orelien acted with "willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory," *Dunnigan*, 507 U.S. at 94, and must make this finding in a

> This, in my judgment, represented a material matter testified to by the defendant falsely, with his knowledge of the falsity.  I believe he deliberately provided that information to the jury for the purpose of obstructing the administration of justice.  More particularly he was trying to confuse the jury.  He was trying to prevent the jury from finding him guilty concerning the charges in the indictment.

147 F.3d at 179.  More recently, in the unpublished case of *United States v. Abreu*, we identified a willfulness finding in the district court's statement that the defendant's untruthful and material statement was "not the type of statement that results from honest confusion or error." 514 F. App'x 13, 16 (2d Cir. 2013) (summary order) (internal quotation marks and citation omitted).

[17] In doing so, we emphasize the less-than-stringent plain-error standard that we apply to our review of sentencing determinations.  *Gamez*, 577 F.3d at 397.  We in no way suggest that the district court made an elementary blunder.

way that allows us to discern the basis for it.

## IV.  Conclusion

We **AFFIRM** the convictions, but **VACATE** the obstruction of justice enhancement and **REMAND** for further proceedings consistent with this opinion.  Upon remand, the district court should reconsider the "willfulness" requirement for the obstruction of justice enhancement and, if supportable, make the required finding.  If, after reconsideration in conformity with this opinion, the court retains the enhancement with the required finding, no further action is required, but if the enhancement is not retained, the district court should resentence Orelien without the enhancement.